**NEW YORK STATE ELECTRIC & GAS CORPORATION,**
Plaintiff,

v.

**SARANAC POWER PARTNERS, L.P.; Lockport Energy Associates, L.P.; The Federal Energy Regulatory Commission; The Public Service Commission of the State of New York and The Chairman, The Deputy Chairman and the Individual Commissioners of the Public Service Commission of the State of New York, Defendants.**

No. 97–CV–1169.

United States District Court,
N.D. New York.

Sept. 29, 2000.

Huber Lawrence & Abell, New York City, NY, for plaintiff, Richard M. Lorenzo, Jonathan D. Schneider, of counsel.

Akin Gump Strauss Hauer & Feld, L.L.P., Washington, D.C., for defendant Saranac, Merrill L. Kramer, Daniel Joseph, of counsel.

Chadbourne & Parke, L.L.P., Washington, D.C., for defendant Lockport, Robert F. Shapiro, Lynn N. Hargis, of counsel.

Federal Energy Regulatory Commission, Washington, D.C., David H. Coffman, of counsel, Public Service Commission of the State of New York, Albany, New York, Carl F. Patka, Michelle L. Phillips, of counsel, Latham & Watkins, Washington, D.C., for Electric Power Supply Association, Amicus Curiae, Edward J. Shapiro, Jared W. Johnson, of counsel.

Cohen Dax & Koenig, P.C., Albany, New York, for National Power Lenders Forum, Amicus Curiae, John W. Dax, of counsel.

Read and Laniado, Albany, New York, for Independent Power Producers of New

York, proposed intervenor, Howard S. Read, Davis B. Johnson, of counsel.

## MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

### I. Introduction

In 1978, Congress passed the Public Utilities Regulatory Policies Act ("PURPA"), 16 U.S.C. § 824a–3, as part of a package of legislation[1] entitled the "National Energy Act." PURPA was designed to promote long-term economic growth by reducing the nation's reliance on oil and gas, encourage the development of alternative energy sources and thereby combat a nationwide energy crisis. Section 210(a) of PURPA required the Federal Power Commission ("FPC"), now known as the Federal Energy Regulatory Commission ("FERC"), to "prescribe, and from time to time thereafter revise" rules requiring electric utilities to offer both to sell and purchase electric energy from qualifying cogeneration facilities ("QFs").[2] 16 U.S.C. § 824a–3(a). Section 210(b) of PURPA required that the rates utilities paid for power purchased from QFs be "just and rea-

sonable to the electric consumers" and "not discriminate" against QFs. 16 U.S.C. § 824a–3(b). Finally, in Section 210(e), PURPA exempted QFs from federal and state regulatory control in connection with rates and financial organization. *See* 16 U.S.C. § 824a–3(e).[3]

Congress also directed that each state regulatory authority implement the rules prescribed by FERC concerning electric utilities' obligation to purchase power from QFs. *See* 16 U.S.C. § 824a–3(f).[4] Pursuant to PURPA, the New York State legislature enacted New York Public Service Law § 66–c, which provided that the defendant New York Public Service Commission ("PSC") shall require state regulated electrical utilities to enter into long-term contracts for the purchase of electricity from alternative energy sources, including cogeneration facilities. *See* N.Y.PUB.SERV. LAW § 66–c. Furthermore, Section 66–c granted PSC authority to oversee the contracting process and set the purchase rate for long-term power contracts. *See id.*

PURPA also contains an elaborate enforcement scheme and provisions for judicial review. *See* 16 U.S.C. § 824a–3(g)–

---

1. In addition to PURPA, the package included the Energy Tax of 1978, Pub.L. 95–618, 92 Stat. 3174; the National Energy Conservation Policy Act, Pub.L. 95–619, 92–Stat. 3206; the Powerplant and Industrial Fuel Use Act of 1978, Pub.L. 95–620, 92 Stat. 3289; and the Natural Gas Policy Act of 1978, Pub.L. 95–621, 92 Stat. 3351. *See FERC v. Mississippi,* 456 U.S. 742, 745, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), n. 2.

2. A qualifying cogeneration facility is defined by PURPA as a small power production facility of "not more than 80 megawatt ("MW") capacity," 16 U.S.C. § 824a–3(a), which produces electric energy primarily by use of solar or wind energy, waste or geothermal resources and is owned by a person "not primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities)." 16 U.S.C. § 796(17)(A)–(E).

3. These requirements were based on Congress' identification of two problems which

impeded the development of non-traditional generational facilities: 1) traditional electrical utilities were reluctant to purchase power from, and sell power to non-traditional facilities; and 2) regulation of non-traditional facilities by state and federal utility authorities imposed undue financial burdens on small alternative energy producers. *See FERC v. Mississippi,* 456 U.S. at 751, 102 S.Ct. 2126.

4. Section 210(f)(1) of PURPA obligates state regulatory agencies to implement FERC's rules through their own rulemaking. Prior to the enactment of PURPA, FERC had exclusive authority to regulate wholesale power rates charged by utilities under the Federal Power Act ("FPA"). *See Arkansas Elec. Co-op. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 381, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). The FPA grants FERC authority to regulate nationwide development of water and power resources, transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce and the licensing and administration of public utilities. 16 U.S.C. § 791a *et seq.*

(h). Section 210(g) provides for (1) state court review of state regulatory authorities' orders implementing PURPA; and (2) state court actions to enforce requirements of state regulatory authorities. *See* 16 U.S.C. § 824a–3(g)(1)–(2). Section 210(h)(1) provides that for enforcement purposes, rules and regulations promulgated pursuant to PURPA shall be treated like FPA rules, *see* 16 U.S.C. § 824a–3(h)(1), which are enforceable by FERC in federal district court. *See* 16 U.S.C. § 825m. Section 210(h)(2)(A) of PURPA provides that FERC may bring an enforcement action against a state regulatory agency in district court, and Section 210(h)(2)(B) allows a utility or cogenerator to petition FERC to enforce Section 210(f) which governs state regulatory authorities' responsibilities to implement PURPA rules and regulations. *See* 16 U.S.C. § 824a–3(h)(2)(B). If FERC declines to bring such an enforcement action, the utility or cogenerator can commence its own enforcement action against the state regulatory authority in district court. *See id.*

Section 210(b) of PURPA declares that "[n]o such rule [promulgated by FERC] ... shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a–3(b). The "incremental cost" to the electric utility of alternative electric energy is defined as "the cost to the electric utility of the electric energy which, but

for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a–3(d). The incremental cost described by Congress in PURPA is defined in the accompanying regulations as "avoided costs," or those costs which the utility "avoided" incurring itself by purchasing power from a QF. *See* 18 C.F.R. § 292.101(b)(6).

Plaintiff, New York State Energy & Gas Corporation ("NYSEG"), a traditional electrical utility, brings the present action principally to obtain relief from long-term contracts with two QFs, defendants Saranac Power Partners, L.P. ("Saranac")[5], and Lockport Energy Associates, L.P. ("Lockport").[6] In each case, NYSEG's contract requires it to pay for energy purchased from these two companies at a fixed rate equal to its estimated long-run avoided costs ("LRACs") as calculated—or miscalculated—in 1988 by NYSEG and other public utilities in conjunction with PSC. Unfortunately for NYSEG, its LRACs as estimated at the time it entered into required contracts with Saranac and Lockport are considerably higher than its current LRAC projections. According to two independent analysts retained by NYSEG, payments under both the Saranac and Lockport agreements will significantly exceed NYSEG's avoided costs over the terms of the agreements.[7] Based on these

---

**5.** Saranac owns and operates a cogeneration facility in Plattsburgh, New York. *See NYSEG*, 71 F.E.R.C. ¶ 61,027, at 61107, 1995 WL 216781 (1995). Saranac entered into a power purchase agreement with NYSEG on April 27, 1990, pursuant to which NYSEG must purchase the net electric output of the facility for a term of fifteen years which commenced upon the facility's commercial operation in June 1994. *See id.*

**6.** Lockport owns and operates a cogeneration facility in Lockport, New York. *See NYSEG*, 71 F.E.R.C., at 61107, 1995 WL 216781. Lockport has a power purchase agreement with NYSEG, executed on March 26, 1990, pursuant to which NYSEG must purchase the net electric output of the facility (less any power sold to Lockport's steam host) for a

term of fifteen years which commenced upon the facility's commercial operation in October 1992. *See id.*

**7.** The two analysts retained by NYSEG are Energy Management Associates ("EMA") and ICF Resources, Incorporated ("ICF"). *See NYSEG*, 71 F.E.R.C., at 61,107, n. 18, 1995 WL 216781. EMA compared payments to be made under the agreements to LRAC estimates for NYSEG calculated by PSC in October 1994. *See id.* ICF used independent assumptions and made its own calculations of NYSEG's avoided costs. *See id.* For the period from January 1, 1995 to the end of the term of each agreement, the analysts predict that payments under each agreement will exceed NYSEG's avoided costs in the following amounts:

predictions, NYSEG asserts that the fixed rates of its power purchase agreements ("PPAs") with Saranac and Lockport are unauthorized under PURPA which limits rates for QF purchases to a utility's "incremental" or avoided costs. 16 U.S.C. § 824a–3(b).

## II. Procedural and Regulatory History

### A. *FERC's Rulemaking*

PURPA required FERC to prescribe regulations to implement the statute "[n]ot later than 1 year after November 9, 1978." 16 U.S.C. § 824a–3(a). Following public rulemaking proceedings, FERC promulgated regulations governing transactions between utilities and QFs in connection with purchase and sales of electricity. *See Small Power Prod. and Cogeneration Facilities; Regs. Implementing Section 210 of [PURPA]*, Order No. 69, 45 Fed.Reg. 12214 (Feb. 25, 1980). In *American Elec. Power Serv. Corp. v. FERC*, 675 F.2d 1226 (D.C.Cir.1982) *("AEP")*, four utilities challenged the legality of the very regulations at issue in this case. There, the court held that FERC failed to adequately explain or justify its adoption of the full avoided cost standard in light of the enabling statute, PURPA, which mandated that rates charged to consumers be reasonable and that rates paid to QFs not exceed utilities' incremental costs. *See AEP*, 675 F.2d at 1232. The plaintiff utilities in *AEP* argued that the "just and reasonable" language regarding purchase rates in Section 210(b) of PURPA required that rates be set at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest. Although FERC could have enacted rules which required states to set PPA rates at less than avoided costs, FERC adopted "as a uniform rule, the maximum purchase rate specified in the statute," after concluding that the full avoided cost standard "would be just and reasonable in every case" as

necessary to encourage cogeneration. *Id.* at 1233. The court found that FERC failed to adequately balance the interests of cogenerators, the public and consumers of electric utilities in rejecting, in an "across-the-board manner," PPA rates below full avoided costs. *Id.* at 1236.

In *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983) *("API")*, the Supreme Court reversed, in part, the D.C. Circuit's determination that FERC had improperly promulgated its avoided cost rules. There, the Court found that FERC had fulfilled its obligation under PURPA to set a rate which was "in the public interest," because "the words 'public interest' in a regulatory statute ... take meaning from the purposes of the regulatory legislation." 461 U.S. at 417, 103 S.Ct. 1921 (quoting *Nat'l Assoc. for the Advancement of Colored People v. FPC*, 425 U.S. 662, 669, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) *("NAACP v. FPC")*). The Court found that the primary purpose of PURPA was to encourage cogeneration and that the "just and reasonable to ... consumers" language of PURPA required FERC only to "consider[ ] ... potential rate savings for electric utility consumers." *Id.* at 415, n. 9, 96 S.Ct. 1806. In the Court's estimation, FERC did consider the possibility of such rate savings, but rejected a percentage-of-avoided-costs approach after determining that purchase rates set at below avoided costs might discourage QF production. *See id.* at 415, 96 S.Ct. 1806 (citing *Small Power Prod. and Cogeneration Facilities; Regs. Implementing Section 210 of [PURPA]*, Order No. 69, 45 Fed.Reg. at 12222–12223).

### B. *PSC Proceedings*

The PSC adopted rules to implement PURPA in 1982. *See Consol. Edison Co. of New York, Inc.*, PSC Case No. 27574,

| | Lockport Agreement | Saranac Agreement |
|---|---|---|
| EMA Prediction: | $784 million | $1.3 billion |
| ICF Prediction: | $580 million | $912 million |

*See id.*

Opinion No. 82–10, 48 P.U.R.4th 94 (May 12, 1982). There, PSC set forth generic guidelines for calculation of a utility's avoided costs. Later, PSC directed NYSEG and other New York utilities to file estimates of their LRACs from 1998 through 2008 by July 1, 1987. *See Opinion and Order Adopting Long–Run Avoided Cost Estimates, Specifying Offer Provisions, and Requesting Comments on Standard Contract Language*, PSC Case No. 28962, 1986 WL 289242 (Mar. 27, 1986). NYSEG filed LRAC estimates, and PSC thereafter adopted LRACs for NYSEG in 1988. *See Opinion and Order Adopting Long–Run Avoided Costs for Major Elec. Utils.*, PSC Case Nos. 28962, 28973, and 28689, Opinion No. 88–13, 1988 WL 391447 (May 10, 1988)

PSC then ordered NYSEG to enter into a fifteen-year contract with Lockport's predecessor in interest, Empire Energy Niagara Limited Partnership ("Empire"). *See Order Granting Petition Subject to Conditions*, PSC Case No. 88–E–216 (Nov. 3, 1989).[8] Although NYSEG objected to the proposed contract because its 1988 LRAC estimates appeared to be too high and PSC rejected its request for a tracking mechanism or "true up" provision that would reconcile estimated avoided costs with actual avoided costs, NYSEG did not appeal PSC's order approving the contract.

On March 5, 1991, PSC approved three contracts between Falcon Seaboard Oil Company ("Falcon"), Saranac's predecessor in interest, and NYSEG. *See Order Approving Contracts Subject to Conditions*, PSC Case Nos. 90–E–0867, 90–E–0865 and 90–E–0860 (Mar. 5, 1991).[9] Again, NYSEG's request for a reconciliation mechanism was rejected by PSC.[10]

---

8. In approving the contract, PSC acknowledged that "Empire's [fixed pricing] proposal offer[ed] several benefits to ameliorate potentially harmful impacts on ratepayers associated with the large size of the project and the inherent uncertainty of LRAC estimates." *Id.* at 19. Indeed, PSC noted that Empire's proposal granted NYSEG graduated discounts from the 1988 LRAC estimates. "Some additional features, such as the absence of a front-load and the dispatchability provisions [reducing the purchase rate for up to 45 MW of energy produced by Lockport which NYSEG might opt not to buy based on cost considerations], offset the risk to ratepayers inherent in fixed pricing based on estimates." *Id.* at 21. However, PSC rejected Empire's 20–year fixed pricing proposal in favor of a 15–year term because "[b]eyond the 15–year period, ... the risk of substantial ratepayer overpayments is simply too great, should actual avoided costs fall well below estimates." *Id.* PSC rejected NYSEG's argument that a tracking and reconciliation mechanism was required, principally because the "remaining terms of the contract were attractive" and such an approach would "treat payments to [QFs] differently from payments to another utility for long-term purchases [which are not reconciled to the utility's avoided costs.]" *Id.* at 22.

9. Falcon subsequently sought approval to consolidate its three projects into one 293.7 MW facility with output to be priced at an increased discount from NYSEG's 1988 LRAC estimates. *See Order Granting Reh'g in Part and Directing Filing of a Contract Supp.*, PSC Case Nos. 90–E–0867, 90–E–0865 and 90–E–0860 (July 12, 1991). NYSEG objected to the pricing provisions of the proposed consolidated contract and sought a larger discount. PSC granted Falcon's petition but did allow NYSEG a greater discount based on the savings [Falcon] can expect in constructing one larger facility rather than three smaller ones. *Id. at* 12. The increased discount was intended to:

> [C]ompensate[ ] ratepayers for the risk of overpayments associated with any fixed-price contract of this length for a facility this large coming on-line after substantial delays threaten to render stale the controlling set of [1988] LRAC estimates.... Moreover, because the preliminary results of utility bidding auctions indicate that existing LRAC estimates may be overstated, a discount of this size is needed to protect against that known risk.

*Id.* at 12–13 (citing *Proceeding to Establish Policies & P. for Power Purchases*, PSC Case No. 90–E–0675, Opinion No. 91–2 (Feb. 21, 1991)).

10. In its order approving the Falcon agreement, PSC noted:

> While reconciliation mechanisms reduce ratepayer risk, and so permit approval of a contract upon a lesser discount than that needed to justify an unreconciled fixed-rate schedule, the 7.4% discount [from NYSEG's 1988 estimated LRACs] ... is sufficient

NYSEG concedes that it did not appeal from either of these orders.

In 1992, PSC reduced NYSEG's estimated LRACs by approximately forty percent. However, NYSEG did not benefit from this revision with respect to its existing contracts, and calculates that the rates it pays under the contracts with Saranac and Lockport are more than triple its actual avoided costs.

## C. FERC Proceedings

On February 14, 1995, NYSEG filed a petition with FERC for a declaratory order and request for modification of rates in the Saranac and Lockport PPAs.[11] In its petition, NYSEG complained that PSC forced NYSEG to enter into the agreements with Lockport and Saranac despite NYSEG's objections that the PPAs did not adequately protect NYSEG's ratepayers against the risk of payments in excess of avoided costs. NYSEG sought three forms of relief from FERC. First, NYSEG demanded that FERC issue a declaratory order finding that PURPA and its accompanying regulations[12] prohibit purchase rates in NYSEG's congressionally mandated PPAs that are in excess of its avoided costs even if such rates were not so excessive at the time the contracts were signed.

NYSEG argued that although it voiced its concern that estimated LRACs would prove to be inflated over the course of the long-term agreements with Saranac and Lockport, the aggregate amount of overpayments to these QFs became evident only after NYSEG's time to appeal the orders of PSC directing the utility to enter into those agreements had elapsed. NYSEG also requested that FERC either take appropriate action itself under section 210(b) of PURPA to reform the Saranac and Lockport PPAs or, under section 210(h)[13], direct PSC to relieve NYSEG of its obligation to make payments in excess of avoided costs under these contracts. Finally, NYSEG asked FERC to waive or revise its rules as necessary to grant the requested relief. In support of its petition, NYSEG relied on FERC's then recent decision in *Connecticut Light & Power Co.*, 70 F.E.R.C. ¶ 61,012, 1995 WL 9931 (1995) *("CL & P")*.[14]

FERC denied NYSEG's petition in its entirety finding in the first instance that the regulations it enacted pursuant to PURPA do not prohibit rates for PPAs which are based on avoided cost estimates at the time a contract is signed even if they exceed a utility's avoided costs at the time of delivery. *See NYSEG*, 70

without reconciliation. This discount ... exceeds the discounts provided under most reconciled contracts.

*Id.* (citing *Order Approving Contracts Subject to Conditions*, PSC Case Nos. 90–E–0867, 90–E–0865 and 90–E–0860, at 16 (citing *Niagara Mohawk Power Corp. and Kamine Eng'g, Inc.*, PSC Case No. 28689 (Mar. 5, 1991)) (Order Approving Contracts Subject to Conditions) (reconciled contracts provided only 5.2% discount)).

**11.** Saranac and Lockport intervened in the FERC proceeding along with PSC. *See NYSEG*, 70 F.E.R.C., at 61,108–09.

**12.** Federal regulations provide that a rates for purchases in PPAs mandated by PURPA "[b]e just and reasonable to the electric consumer of the electric utility and in the public interest," and "not discriminate against [QFs]." 18 C.F.R. § 292.304(a)(1). The regulations also repeat PURPA's prohibition against purchase

rates which exceed a utility's avoided costs. *See* 18 C.F.R. § 292.304(a)(2).

**13.** Section 210(h) of PURPA sets forth procedures and authority for FERC to enforce Section 210(f) (requiring state regulatory authorities to implement FERC's rules and regulations) against state utility regulatory authorities which fail to comply with PURPA. *See* 16 U.S.C. § 824a–3(h)(2)(A).

**14.** There, FERC declared that a Connecticut statute, which, as applied, could require electric utilities to purchase power from certain types of QFs (resource recovery facilities owned or operated for the benefit of municipalities) at a rate above avoided cost, was preempted by PURPA. *See CL & P*, 70 F.E.R.C., at 61,029, 1995 WL 15832. FERC rejected the argument that the preamble to its own rules and regulations under PURPA suggested that states could set rates above avoided costs. *See id.*

F.E.R.C., at 61,116. To wit, FERC cited 18 C.F.R. § 292.304(b)(5) which states:

> In the case in which rates for purchases are based upon estimates of avoided costs over the specific term of the contract or other legally enforceable obligation, the rates for such purchases do not violate this subpart if the rates for such purchases differ from avoided costs at the time of delivery.

*Id.*[15] FERC recognized when the above regulation was enacted that avoided costs could change over time and attempted to reconcile the requirement that utilities pay no more than their avoided costs for purchases with the need for QFs to enter contractual commitments based "by necessity, on estimates of future avoided costs." *Id.*[16] Indeed, FERC anticipated that if the avoided cost of power was less when delivered than the price in the PPA, the utility would be subsidizing the QF "at the expense of the utility's other ratepayers." *Id.* However, FERC was also:

> cognizant that in other cases, the required rate will turn out to be lower than the avoided costs at the time of purchase. The Commission [FERC] does not believe that the reference in [PURPA] to incremental cost of alternative energy was intended to require a minute-by-minute evaluation of costs which would be checked against rates established in long term contracts between [QFs] and electric utilities.

Many commentators have stressed the need for certainty with regard to return on investment in new technologies. The Commission agrees with these latter arguments, and believes that, in the long run, "overestimations" and "underestimations" will balance out .... The import of [18 C.F.R. § 292.304(b)(5) ] is to ensure that a [QF] which has obtained the certainty of an arrangement is not deprived of the benefits of its commitment as a result of changed circumstances. This provision can also work to preserve the bargain entered into by the electric utility.

*Id.*

Based on this regulatory history, FERC declined to issue the declaratory ruling requested by NYSEG stating it was "far too late" for "NYSEG to argue, for the first time, that these particular regulations have legal and policy flaws requiring that we abrogate contracts entered into under these regulations." *NYSEG*, 70 F.E.R.C., at 61,116. Moreover, FERC refused to "second-guess" PSC's determination of LRACs, finding that PSC's implementation of its rules and regulations was proper and consistent with PURPA. *Id.*[17] FERC noted that when PSC mandated the Saranac and Lockport contracts, it "specifically addressed and accounted for" the very risk of harm about which NYSEG complained in its petition. *NYSEG*, 70 F.E.R.C., at 61,116. Instead of requiring protective

15. Federal regulations provide that QFs are permitted to enter into long-term PPAs in which the purchase rate is based on utilities' avoided costs calculated—at the QF's option—either at the time the contract is executed or at the time the energy is delivered. *See* 18 C.F.R. § 292.304(d)(2). A rate calculated on a utility's avoided costs, determined after consideration of prescribed factors, satisfies the criteria of 18 C.F.R. § 292.304(a) governing rates for purchases. *See* 18 C.F.R. § 292.304(b)(2).

16. (Citing *Small Power Prod. and Cogeneration Facilities; Regs. Implementing Section 210 of [PURPA]*, Order No. 69, 45 Fed.Reg. at 12224, *[FERC Statutes and Regs., Regs. Preambles] 1977–1981* ¶ 30,128, at 30,880

(1980), *order on reh'g, FERC Statutes and Regs., Regs. Preambles 1977–1981* ¶ 30,160 (1980), *aff'd in part and vacated in part, AEP*, 675 F.2d 1226, *rev'd in part, API*, 461 U.S. 402, 103 S.Ct. 1921).

17. Indeed, NYSEG argued as much before FERC:

> In ordering NYSEG to accept the terms of the Lockport and Saranac agreements, the New York Commission was carrying out its statutory mandate under Section 210(f) of PURPA to implement the Commission's rules ... grant[ing] the states broad authority to determine the specific parameters of QF power purchase agreements.

*NYSEG*, 70 F.E.R.C., at 61,116 (quoting NYSEG's petition at pp. 37–38).

mechanisms such as avoided cost tracking and reconciliation provisions as it had in other PPAs, FERC noted PSC chose to account for any potential risk of fluctuations in LRACs by applying a discount to the LRAC estimates used to formulate the Saranac and Lockport agreements. *See id.* at n. 42.[18] FERC stated that NYSEG's case was distinguishable from *CL & P*, where PPA rates which "may have exceeded avoided costs *at the time the rates were imposed,*" were violative of Section 210(b) of PURPA. *Id.* (emphasis in original). Because the Saranac and Lockport contracts "reflect[ed] State implementation consistent with PURPA and [FERC's] regulations," FERC declined to disturb them. *Id.*

FERC stated that a "second, independent basis for denying NYSEG's Petition is the Commission's policy against invalidating contracts for which a PURPA-based challenge was not raised timely and is still not pending." *Id.* FERC noted that NYSEG, "believing it had 'neither a cognizable injury nor a basis to complain further to [PSC] or [FERC],' chose not to appeal [PSC's] orders mandating the agreements." *Id.* (quoting NYSEG's petition at pp. 3–5, 17, 47). According to FERC, this was unlike the facts in *CL & P* where the utility had been continuously challenging the subject PPA rate—which might have exceeded avoided costs depending upon application of an alleged unlawful state statute—since the state regulatory authority mandated the contract. *Id.* (citing *CL & P*, 70 F.E.R.C., at 61,029, 1995 WL 15832). "We believe that the appropriate time in which to challenge a state-imposed

rate for a QF purchase is up to the time the purchase contract is signed, not years into a contract." *Id.* (quoting *In re Southern California Edison Co.*, 70 F.E.R.C. ¶ 61,215, at 61,678, 1995 WL 169000 (1995) ("*California*"); *CL & P*, 70 F.E.R.C., at 61,029, 1995 WL 15832). FERC concluded by noting:

> In this case, Lockport and Saranac (and their investors) invested in these projects in the reasonable belief that, once the deadline for timely challenges had passed, their contracts with NYSEG were lawful and binding under PURPA.... [T]he contracts at issue allocated risks to both the purchaser and the sellers. Like NYSEG, Lockport and Saranac bore risks that their agreements would become uneconomic over time. QFs bear development risks not experienced to the same extent by traditional utilities. As a result, they must rely on their [PPAs] to obtain project financing, and we have recognized the importance of contractual reliance for this purpose, if we were to grant the relief requested by NYSEG and allow the reopening of QF contracts that had not been challenged at the time of their execution, financeability of such projects would be severely hampered. Such a result is not, in our opinion, consistent with Congress' directive that we encourage the development of QFs.

*NYSEG*, 70 F.E.R.C., at 61,118 (citations omitted).

NYSEG petitioned for rehearing,[19] on the bases that FERC erred by: 1) relying on PSC's estimates of LRACs; 2) failing to relieve NYSEG from PPA rates which

---

18. (citing *Order Approving Contracts Subject to Conditions*, PSC Case Nos. 90–E–0867, 90–E–0865 and 90–E–0860, at 16 (citing *Niagara Mohawk Power Corp. and Kamine Eng'g, Inc., Order Approving Contracts Subject to Conditions*, PSC Case No. 28689, 1985 WL 258033 (Mar. 5, 1991) (reconciled contracts provided only 5.2% discount))).

19. Although NYSEG styled its petition as one requesting a rehearing, FERC deemed it to request reconsideration. Citing *Indus. Cogenerators v. FERC*, 47 F.3d 1231 (D.C.Cir.1995) (holding that appellate courts have no juris-

diction to review non-binding FERC orders interpreting its own regulations under Section 210 of PURPA), FERC concluded that "formal rehearings do not lie, either on a mandatory or a discretionary basis, in cases that involve solely Section 210 [PURPA] issues." *NYSEG*, 72 F.E.R.C. ¶ 61,067, at 61,340 (1995). NYSEG argued that its petition involved more than an enforcement action under Section 210(h) of PURPA because it had asked FERC to review and modify the rules implementing PURPA and reform the Saranac and Lockport PPAs pursuant to Section 206 of the FPA. *See*

violate Section 210(b) of PURPA; and 3) failing to modify PPA rates which violate PURPA pursuant to Section 206 of the FPA.[20] FERC denied NYSEG's request for reconsideration finding that the arguments therein were merely "restatements" of the arguments NYSEG made in its original petition. *NYSEG*, 72 F.E.R.C., at 61,340. FERC noted:

> Nevertheless, we are not unsympathetic to the concern of utilities that find themselves with legally binding QF contracts that contain rates that currently are above avoided cost. As we have previously explained, we believe that the remedy appropriate to this situation is to allow utilities to buy-out or buy-down such contracts, not to invalidate them. If utilities are prudent in buying out or buying down existing [PPAs], whether or not with QFs, we have indicated that we will permit the recovery in wholesale rates of a pro rata share of the buy-out or buy-down costs.

*NYSEG*, 72 F.E.R.C., at 61,341 (citing *West Penn Power Co.*, 71 F.E.R.C. ¶ 61,-153, at 61,497, 1995 WL 265343 (1995)).

### D. *District of Columbia Circuit Decision*

NYSEG then petitioned the United States Court of Appeals, District of Columbia Circuit for review of FERC's denial of its petition.[21] In *NYSEG v. FERC*, 117 F.3d 1473 (D.C.Cir.1997), the court dismissed NYSEG's appeal for want of jurisdiction. The court held that "[b]ecause the challenged order does nothing more ... than announce the position that [FERC] might take in an enforcement action[22] before a federal district court, we are without jurisdiction to review it." *NYSEG v. FERC*, 117 F.3d at 1474. To wit, the court noted that its "review of [FERC's] non-binding assessment of ... PSC's compliance with ... PURPA would bind the district court in any future enforcement action, thereby usurping that court's role as the court of first instance in all matters concerning implementation of the statute." *Id.* at 1475. "[I]t is always the district court that first passes upon the merits of whatever position the Commission may take concerning the implementation of ... PURPA." *Id.* at 1476 (citing *Indus. Cogenerators*, 47 F.3d at 1234–35). Because "[t]he failure of a state commission to ensure that a rate does not exceed a utility's avoided cost is a failure to comply with a regulation implementing ... PURPA," the court reasoned that NYSEG must challenge PSC through an enforcement action in district court. *NYSEG v. FERC*, 117 F.3d at 1476.

The court rejected NYSEG's argument that judicial review of FERC's order would not disturb PURPA's enforcement scheme because FERC could have granted all of the relief NYSEG requested pursuant to the FPA. While acknowledging that NYSEG had requested relief under the FPA, "[FERC's] denial of that relief was based upon determinations that would, if

---

*id.* FERC disagreed that the arguments in NYSEG's petition were "sufficiently broad to warrant rehearing." *NYSEG*, 72 F.E.R.C., at 61,340. Indeed, FERC concluded that each of NYSEG's arguments was "grounded on the lawfulness of the Lockport and Saranac purchase rates under; and our authority granted by, section 210 of PURPA." *Id.* Thus, "to the extent that [FERC] in its discretion" wished to consider NYSEG's application, it would be "treated as a request for reconsideration." *Id.*

**20.** The FPA provides that if, after a hearing conducted on its own motion or upon complaint, the commission (FERC) finds that any rate for any transmission or sale subject to its jurisdiction is "unjust, unduly discriminatory or preferential," the agency shall determine a just rate and "fix the same by order." 16 U.S.C. § 824e(a).

**21.** Saranac and Lockport also intervened in the District of Columbia Circuit proceedings.

**22.** Under PURPA, FERC may bring an enforcement action in federal district court against any state electrical regulatory authority which fails to implement FERC regulations designed to encourage cogeneration. *See* 16 U.S.C. § 824a–3(h)(2)(A). Alternatively, a utility or cogenerator may petition FERC to bring such an action and, if the agency declines, may itself sue the state regulatory authority in district court. *See* 16 U.S.C. § 824a–3(h)(2)(B).

made binding upon the district court, be dispositive of any future enforcement action under § 210(h) [of PURPA]." *Id.* at 1477. The court was not persuaded by NYSEG's argument that it had not yet commenced—nor would it need to commence—an enforcement action if the court determined that FERC's denial of its petition was contrary to law. "[N]othing in ... PURPA suggests that the Congress let our jurisdiction turn upon a party's choice whether to pursue its statutory remedy." *Id.* The court concluded by stating:

> At bottom, each of NYSEG's requests to [FERC] for relief is effectively a challenge to the rates set by ... PSC. In response to these requests [FERC] did nothing more than state why in its opinion the challenged rates comply with PURPA. Under the enforcement scheme set up by the Congress, NYSEG may now bring an enforcement action under § 210(h)(2)(B) of ... PURPA, in which case the district court will assess the merits giving [FERC's] opinion such consideration as it may deserve.

*Id.* at 1477.

### E. *The Present Complaint and Cross–Claim*

On August 7, 1997, NYSEG filed a complaint against FERC, PSC and various officials of the PSC, Saranac, and Lockport.[23] In the first count of the complaint, NYSEG alleges that by failing to take any action with respect to its petition 1) for a declaratory order (that the contracts with Saranac and Lockport violate PURPA); and 2) for modification of rates imposed in the PURPA power purchase agreements with Saranac and Lockport, FERC violated PURPA and the Administrative Procedure Act ("APA")[24]. NYSEG demands that FERC initiate whatever waivers or rulemaking is necessary to relieve NYSEG from the allegedly illegal obligations of these contracts.

NYSEG also alleges that in its order denying NYSEG's petition, FERC declared a new administrative rule which it dubs the "Continuous Challenge Rule."[25] To wit, NYSEG alleges FERC's denial of its petition on this basis constitutes improper rulemaking under the APA because FERC gave no prior notice of its intent to require parties to continually challenge regulations in order to preserve a claim for relief in subsequent administrative proceedings and did not conduct formal notice and comment procedures in promulgating this alleged new rule. *See Zhang v. Slattery*, 55 F.3d 732, 744–45 (2d Cir.1995) (interim rule promulgated by Attorney

---

**23.** PSC moved to intervene as a party plaintiff and Independent Power Producers of New York also moved to intervene as a defendant. By order dated February 25, 1998, then U.S. Magistrate Judge David N. Hurd denied these motions without prejudice subject to renewal upon this Court determination of the parties' dispositive motions.

**24.** The APA, codified at 5 U.S.C. § 551 *et seq.*, prescribes procedures by which federal agencies may promulgate rules and make adjudicative determinations. The APA also establishes a right to judicial review of such rulemaking and agency decisions:

> A person suffering a legal wrong because of agency action, or adversely or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702. The APA serves as a default mechanism for review in instances where re-

view procedures are not specified in a governing statute. *See Bowen v. Massachusetts*, 487 U.S. 879, 903, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) ("Congress did not intend the general grant of review in the APA to duplicate existing [statutory] procedures for review of agency action.")

**25.** In its order denying NYSEG's petition, FERC noted NYSEG had not continuously challenged the PURPA regulatory scheme from its inception. *See NYSEG*, 70 F.E.R.C., at 61,117. Rather, FERC found NYSEG waited until it was aggrieved by the regulations to complain. *See id.* This was unlike the facts in *CL & P*, 70 F.E.R.C., at 61,029, 1995 WL 9931, where FERC found the utility had been complaining from the outset regarding the purchase rate in the subject PPA as affected by the alleged unlawful state statute.

General which directly contradicted Board of Immigration Appeals decision denying asylum to Chinese citizens seeking to avoid China's "one couple, one child" policy was never properly promulgated as legislative rule under APA, where rule changed existing policy and was never subject to notice and comment period).

In its second and third claims for relief, NYSEG alleges that PSC's orders which set LRACs and directed NYSEG to enter into the Saranac and Lockport contracts: 1) violated PURPA and its implementing rules; and 2) violated the Supremacy Clause of the United States Constitution. NYSEG's fourth claim is an enforcement action against PSC pursuant to Section 210(h)(2)(B) of PURPA for failure to implement PURPA properly.

NYSEG's fifth, sixth and seventh claims run against the QF's directly and allege illegality of the PPAs, frustration of purpose and mutual mistake under New York contract law. NYSEG requests relief from performance and restitution.

Allied with NYSEG in part, PSC cross-claimed against FERC alleging that FERC violated PURPA when it failed to reform the Saranac and Lockport PPAs. Relying on the FPA from whence PURPA came, PSC alleges that FERC has authority, after giving notice, soliciting comments and conducting public hearings, to modify utility rates in the public interest. PSC also alleges that PURPA itself requires FERC to revisit its regulations from time to time. PSC claims that federal regulations also grant FERC authority to revisit the issue of QF exemption from utility-type rate regulation and limit the exemptions if necessary. According to PSC, FERC can limit or change the exemptions and then modify the contracts prospectively so that going forward, the PPAs no longer violate PURPA's prohibition against purchase rates which exceed avoided costs. Finally, PSC alleges that FERC's failure to take any action with respect to the Saranac and Lockport contracts is a violation of the APA.

### F. The Present Motions

All defendants move pursuant to Fed. R.Civ.P. 12 to dismiss NYSEG's claims against them. Saranac, Lockport, and FERC also seek dismissal of PSC's cross-claim. National Power Lenders Forum ("NPLF") and the Electric Power Supply Association ("EPSA") filed amicus briefs in support of the positions taken by Saranac, Lockport, and FERC.[26] Also pending before the Court—but stayed at the present time—are motions for summary judgment or partial summary judgment filed by Saranac, PSC and NYSEG.[27]

### III. Discussion

#### A. Motions to Dismiss Count I (N.Y.SEG's Claims Against FERC)

##### 1. Personal Jurisdiction

FERC argues in the first instance that NYSEG's claims against it should be dismissed for insufficiency of service of process because NYSEG admittedly failed initially to serve a copy of its summons and complaint on the U.S. Attorney's Office in this district and mail copies of the documents to the Attorney General of the United States as required by Fed.R.Civ.P. 4(i) (governing service of process on the United States and federal agencies). On October 14, 1997, NYSEG complied with this procedural requirement by serving both

---

26. U.S. District Judge Rosemary S. Pooler (now a Circuit Judge for the Second Circuit Court of Appeals), to whom this matter was originally assigned, denied untimely requests to file amicus briefs in support of NYSEG and PSC from the Energy Association of New York ("EA") and the New York State Consumer Protection Board ("CPB") by order dated May 8, 1998.

27. Recognizing that a ruling on defendants' dismissal motions might moot the various motions for summary judgment, Judge Pooler granted requests to stay resolution of the latter motions by order dated February 5, 1998.

the district office of the U.S. Attorney and the U.S. Attorney General well within the 120–day time limit set forth in Fed. R.Civ.P. 4(m). In its reply memorandum of law, FERC appears to have abandoned this ground for relief and thus, the Court finds it has personal jurisdiction over FERC herein.

### 2. *Subject Matter Jurisdiction*

#### a. Arguments of the Parties

FERC, along with Saranac and Lockport, argue that this Court lacks subject matter jurisdiction over NYSEG's claims against FERC. These defendants argue that PURPA's enforcement scheme does not authorize a direct action against FERC in district court. Rather, they argue, Section 210(h)(2) of PURPA only authorizes FERC or another aggrieved party to bring an action against a state regulatory authority such as PSC or a non-regulated utility in district court. *See* 16 U.S.C. § 824a–3(h)(2).[28]

In response to this argument, NYSEG asserts that the APA provides for judicial review by a district court of FERC's decision not to take any action with respect to its petition for relief from and modification of the contracts. FERC, Saranac and

Lockport argue that APA review by this Court is not authorized because: 1) APA review of an agency determination is only available if an aggrieved party has no place else to go for relief. *See Bowen v. Massachusetts*, 487 U.S. at 901, 108 S.Ct. 2722. According to these defendants, NYSEG has an adequate remedy short of APA review because it can sue PSC in an enforcement action under Section 210(h)(2) of PURPA. *See New York City Employees' Retirement Sys. ("NYCERS") v. Securities and Exchange Commission ("SEC")*, 45 F.3d 7, 14 (2d Cir.1995) (litigants with remedies against parties other than the administrative agency which rendered an adverse determination are not entitled to APA review of said agency's action); *Marlow v. United States Dep't of Educ.*, 820 F.2d 581, 583 (2d Cir.1987).[29] Moreover, these defendants argue that FERC's decision *not* to take enforcement action with respect to NYSEG's petition is unreviewable as a matter reserved exclusively to its discretion. *See Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (federal agency's decision not to prosecute or enforce rules and regulations is presumptively unreviewable under the APA).[30]

---

**28.** Subsection (A) of PURPA Section 210(h)(2) authorizes FERC to enforce state implementation of its regulations against a state regulatory authority or non-regulated utility in district court while subsection (B) allows an electric utility or QF to petition FERC to commence such an action. If FERC declines to do so, the utility or QF may commence its own action to force a state agency or non-regulated utility to comply with FERC's regulations. *See* 16 U.S.C. § 824a–3(h)(2). In the present case, NYSEG, an electrical utility, seeks enforcement of the statutory requirements of PURPA as well as select PURPA regulations directly against FERC.

**29.** In *Marlow*, a disabled school teacher filed an administrative complaint with the federal Education Department alleging discriminatory failure to hire by the New York City Board of Education Examiners in violation of the federal Rehabilitation Act. 820 F.2d at 581. The Regional Office for Civil Rights ("OCR") later determined that plaintiff was not "other-

wise qualified handicapped person" within meaning of the Act because no reasonable accommodation could be made to allow plaintiff, who suffered from a psychiatric disorder, to perform the essential functions of the teaching job. *See id.* The court found that plaintiff's suit for review of OCR's determination under the APA was barred because the APA restricts judicial review to those agency actions for which "there is no other adequate remedy in court" and plaintiff could have sued the Board directly under the Rehabilitation Act. *See id.* at 583, n. 3.

**30.** This presumption can be rebutted if the substantive statute contains guidelines for the agency to follow in exercising its enforcement powers. *Heckler v. Chaney*, 470 U.S. at 833, 105 S.Ct. 1649. To wit, if Congress has provided meaningful standards for measuring the limits of the agency's discretion, there is "law to apply" under Section 701(a)(2) of the APA and "courts may require the agency follow that law." *Id.* at 834–35, 105 S.Ct. 1649.

Undaunted, NYSEG counters that there is a strong presumption in favor of judicial review of agency action which can be overcome only by clear and convincing evidence of a contrary legislative intent. *See Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670–71, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) (citing *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). With respect to the presumptive unreviewability of discretionary agency decisions, NYSEG argues that it is not asking this Court to review FERC's discretionary decision not to enforce PURPA against PSC,[31] but only FERC's decisions not to: 1) take action itself under PURPA or FPA § 206(a) to relieve NYSEG of the alleged illegal obligations imposed by the Saranac and Lockport PPAs; and 2) amend or waive its own rules to provide NYSEG's requested relief. NYSEG also contends that FERC unlawfully promulgated a binding rule of general applicability when it held that it would not undo a signed PPA unless the petitioning party had mounted a continuous challenge to the rates in that contract from its inception.[32] According to NYSEG, this new "Continuous Challenge Rule" is not an enforcement decision reserved to FERC's discretion and is therefore subject to judicial review under the APA.

Moreover, NYSEG claims entitlement to APA review of FERC's action in this case because the available remedy against PSC set forth in PURPA's enforcement scheme is inadequate to provide the utility with all of the relief it seeks herein. In the first instance, NYSEG argues that the Third Circuit's decision in *Freehold Cogeneration Assoc. v. Bd. of Regulatory Comm'rs. of the State of New Jersey,* 44 F.3d 1178 (3d Cir.1995), *cert. denied,* 316 U.S. 815, 116 S.Ct. 68, 133 L.Ed.2d 29 (1995) (state agencies such as PSC are preempted from altering PURPA contracts once ordered and approved), may prevent this Court from directing relief against PSC. Moreover, NYSEG argues, it could not challenge: 1) FERC's failure to reform the Saranac and Lockport contracts; 2) FERC's refusal to amend or waive its rules; or 3) FERC's "continuous challenge rule" in an enforcement action against PSC under Section 210(h)(2) of PURPA. NYSEG asserts that it must sue FERC directly to escape a "regulatory runaround."

FERC insists that NYSEG's arguments regarding the inadequacies of PURPA's regulatory scheme are an attempt to extricate itself from the effects of its own ill-considered prior litigation strategy. FERC argues that NYSEG could have, but did not, challenge FERC's rules and PSC rules which required utilities to enter long term contracts based on estimated LRACs at the time the rules were promul-

---

Otherwise, an agency's decision to not pursue an enforcement action is presumptively unreviewable as "committed to agency discretion by law." *Id.* at 835.

**31.** In the alternative, NYSEG argues that FERC's refusal to bring an enforcement petition is subject to challenge because PURPA provides clear guidelines for the exercise of FERC's discretionary authority by prohibiting PPA rates which exceed avoided costs. *See* 16 U.S.C. § 824a–3(b); *Heckler v. Chaney,* 470 U.S. at 834–35, 105 S.Ct. 1649. Moreover, NYSEG insists that *Heckler v. Chaney* does not preclude this Court from reviewing other aspects of its claims against FERC even if the complaint in part addresses the FERC's refusal to bring an enforcement action. *See NYCERS v. SEC,* 843 F.Supp. 858, 867–68

(S.D.N.Y.1994), *rev'd in part on other grounds,* 45 F.3d 7 (2d Cir.1995) (new rule announced by SEC was reviewable by court even though rule was adopted in the context of the agency's determination not to exercise its prosecutorial discretion and though decision not to prosecute was itself committed to agency's discretion and not reviewable); *Int'l Union v. Brock,* 783 F.2d 237, 246 (D.C.Cir.1986) ("Even if a statutory interpretation is announced in the course of a nonenforcement decision, that does not mean that it escapes review altogether.").

**32.** The APA defines a rule as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy." 5 U.S.C. § 5514(4).

gated. Neither did NYSEG appeal the PSC orders directing it to enter into the Saranac and Lockport contracts with no "tracking" provisions to account for shifts in the market price for energy.

As to NYSEG's argument that it seeks review of FERC's refusal to modify the QF contracts, FERC argues that it has no statutory authority to do so under either PURPA § 210 or FPA § 206(a) because these Acts contain no such explicit authority and, contrary to NYSEG's arguments, the power to reform PPAs cannot be inferred from PURPA's statutory mandate that: 1) rates paid to qualifying facilities ("QF's") not exceed the "incremental cost to the electric utility of alternative electric energy;" [33] and 2) FERC shall create "and from time to time revise" [34] its rules as necessary to implement the statute. FERC also denies that implied authority to reform the Saranac and Lockport PPAs may derive from Congress' intent that PURPA contract rates be "just and reasonable to the electric consumers of the electric utility and in the public interest." 16 U.S.C. § 824a–3(b)(2).

FERC asserts that the FPA likewise provides no avenue for relief because PURPA regulations expressly exempt QFs such as Saranac and Lockport from the FPA section relied on by NYSEG, which allows FERC to prescribe proper rates if it determines a power purchase rate to be unreasonable. See 16 U.S.C. § 824e(a); 18 C.F.R. § 292.601. Saranac argues additionally that the FPA vests exclusive jurisdiction over review of FERC orders implementing the FPA in the Courts of Appeals.[35] Thus, in Saranac's estimation, this Court has no subject matter jurisdiction to review FERC orders interpreting the FPA.

In response to NYSEG's argument that FERC must promulgate new avoided cost rules to relieve them from contracts which have become grossly unprofitable, FERC asserts that this claim is not yet ripe because NYSEG's underlying administrative petition did not formally petition the agency for new rule-making.[36] According to FERC, even if it treated NYSEG's underlying petition as one for rulemaking, it could not retroactively alter its rules to invalidate the Saranac and Lockport PPAs. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208–09, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("statutory grant of rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms").[37] Finally, FERC denies

**33.** 16 U.S.C. § 824a–3(b).

**34.** 16 U.S.C. § 824a–3(a).

**35.** Under the FPA, a party aggrieved by a FERC order may apply for a rehearing within thirty (30) days of issuance of the order. See 16 U.S.C. § 825l(a). A party may obtain review of the order in the Court of Appeals for the circuit in which the party is located or has its principal place of business or in the D.C. Circuit Court of Appeals by filing a petition within sixty days after FERC denies rehearing. See 16 U.S.C. § 825l(b).

**36.** Under Section 4(e) of the APA, any interested person may "petition for the issuance, amendment or repeal of a rule." 5 U.S.C. § 553(e). In South Hills Health Sys. v. Bowen, 864 F.2d 1084, 1086 (3rd Cir.1988), the court held that the district court had no jurisdiction to consider a hospital's claim that a Health Care Financing Administration ("HCFA") regulation requiring disclosure of hospitals' Medicare cost reports was arbitrary and capricious as "no longer viable or realistic" because no party had ever petitioned HCFA for reconsideration or repeal of the rule under Section 553(e) of the APA.

**37.** According to NYSEG, revision of FERC's regulations would not involve retroactive application in the true sense because the regulations which allow for rates in excess of avoided costs were always invalid or ultra vires FERC's statutory authority in light of PURPA which mandates that "no ... rule prescribed ... shall provide for a rate which exceeds" avoided costs. 16 U.S.C. § 824a–3(b). In Nat'l Labor Relations Bd. v. Fed. Labor Relations Auth., 834 F.2d 191, 196–97 (D.C.Cir. 1987) ("NLRB v. FLRA"), the court held that a claim involving an agency regulation which purportedly conflicts with the statute from which its authority derives is reviewable pursuant to the APA.

that the so-called "continuous challenge rule" is new or that it is even a "rule" with the legislative effect alleged by NYSEG. Indeed, FERC insists that its declination to invalidate PURPA contracts which were not challenged when the contracts were signed was merely an explanation of why it was declining to take action on NYSEG's petition—an enforcement decision reserved exclusively to its discretion under *Heckler v. Chaney.*[38]

### b. Analysis

At its core, each of NYSEG's claims against FERC revolves around the same premise which is that PURPA, an enabling regulatory statute, provides "no rule prescribed [by FERC] ... shall provide for a rate which exceeds the incremental cost of the electric utility of alternative electric energy," 16 U.S.C. § 824a–3(b). While NYSEG argues that this provision of PURPA prohibits *rates* which exceed a utility's avoided costs, the Court interprets it to prohibit *enactment of a rule* which mandates a PPA rate in excess of avoided costs. Indeed, NYSEG recognizes as much by arguing that "[d]efendants focus entirely on FERC's rules, while ignoring PURPA's substantive requirement that dictates *such rules* cannot provide for rates above a utility's avoided cost." *See* Docket 36, Memorandum of Law of NYSEG in Opposition to Motions to Dismiss ("NYSEG Brief"), p. 25 (emphasis added). Review of PURPA regulations reveals that FERC has never enacted such a rule.

When FERC promulgated regulations pursuant to PURPA, it recognized that purchases between QF's and utilities might occur as the QF determined it had excess alternative energy to sell in which case rates for purchases would be based on the utility's avoided costs at the time of delivery of the power. *See* 18 C.F.R. § 292.304(d)(1). When the purchase oc-

curred by way of a long-term contract, however, FERC gave the QF the option of basing the purchase rate on avoided costs calculated at the time it actually delivered energy to the utility over the course of the contract *or* as estimated at the time it signed the contract. *See* 18 C.F.R. § 292.304(d)(2). In neither case, however, do the rules regarding purchases mandate a rate in excess of avoided costs.

FERC obviously anticipated a circumstance where estimated LRACs would differ in some respect from actual avoided costs at the time power was delivered pursuant to a long-term PPA. To wit, FERC ruled that in the event that a purchase rate "differs from avoided costs" at the time energy is delivered pursuant to a long-term PPA, such rate does not violate PURPA. 18 C.F.R. § 292.304(b)(5). The regulatory history associated with this regulation reveals it was enacted to "address[ ] the situation in which a QF has entered into a contract with an electric utility or where the QF has agreed to obligate itself to deliver at a future date energy and capacity to the electric utility." *Small Power Prod. and Cogeneration Facilities; Regs. Implementing Section 210 of [PURPA],* Order No. 69, 45 Fed.Reg. at 12224. "The import of this section is to ensure that a QF which has obtained the certainty of an arrangement is not deprived of the benefits of its commitment as a result of changed circumstances." *Id.* No fair reading of the regulation can characterize it as mandating a PPA rate in excess of a utility's avoided cost. 18 C.F.R. § 292.304(b)(5) merely accounts for and forgives the possibility that market fluctuations might cause a PPA rate to be higher than a utility's actual avoided costs when power is actually delivered over the course of a long-term contract.

---

38. Saranac characterizes FERC's alleged "Continuous Challenge Rule" as an interpretive statement whereby FERC acknowledged its lack of retroactive rulemaking authority while Lockport asserts that it was merely an "administrative restatement of the public policy behind the doctrine of collateral estoppel." Both QFs maintain, however, that the alleged "rule" does not pave the way for APA review.

Thus, FERC's 1980 regulations anticipated and accounted for the very straits in which NYSEG now finds itself. The only question is whether there is anything NYSEG can do about it twenty years later. NYSEG contends FERC's failure to rescind or reform the Saranac and Lockport PPAs or waive or modify its rules to relieve them of these contractual burdens violates PURPA, the FPA and the APA. By its terms, PURPA does not authorize a direct action by any party against FERC. FERC's actions are, however, under certain circumstances, subject to judicial review pursuant to both the FPA[39] and the APA.[40] It is undisputed that NYSEG did not seek review of FERC's 1980 PURPA regulations pursuant to the FPA. Thus, the only avenue, if any, of judicial review available to NYSEG at the present time may be found in the APA.

NYSEG's assertion of an action against FERC pursuant to the APA presupposes that it has no adequate alternative remedy, an issue of intense debate between the parties. Defendants point to PURPA's elaborate enforcement scheme and NYSEG's statutory right to sue PSC as an adequate alternative remedy thus precluding judicial review. NYSEG argues that it cannot get full satisfaction by suing PSC alone. To wit, it contends that it cannot obtain review of FERC's failure to act on its petition or FERC's alleged promulgation of a new rule in an enforcement action against PSC.

The Court agrees that the inadequacies of which NYSEG complains in connection with PURPA's enforcement scheme, inso-

far as it precludes the relief NYSEG now seeks against FERC, are due, in whole or large part, to: 1) NYSEG's failure to challenge FERC's rules, specifically 18 C.F.R. § 292.304(b)(5) and/or the exemption provisions in 18 C.F.R. § 292.602, pursuant to the FPA when these regulations were enacted as did the plaintiffs in *API;* 2) NYSEG's failure to have petitioned FERC for amendment or recission of these regulations and then appealed a denial pursuant to the APA as the plaintiffs did in *NLRB v. FLRA;*[41] and 3) NYSEG's failure to challenge PSC's implementation of FERC's PURPA regulations in orders which set NYSEG's LRACs and compelled the utility to enter long-term PPAs with Saranac and Lockport.

NYSEG's failure to appeal from or challenge PSC's orders implementing PURPA regulations is particularly telling because although NYSEG claims it did not understand the degree to which FERC's regulations would affect it negatively at the time they were promulgated, it clearly knew when the Saranac and Lockport agreements were being negotiated that 18 C.F.R. § 292.304(b)(5) and/or the exemption regulations might result in its subsidy of the QFs if avoided cost estimates turned out to be wrong. Thus, NYSEG requested and was denied a protective "tracking mechanism" to reconcile actual avoided costs with the contract prices in both PPAs. In lieu of appealing these PSC orders, NYSEG settled for contract rates set at a discount from its estimated LRACs. However, these discounts have proved in-

---

**39.** *See* 16 U.S.C. § 825*l*(b) (under FPA, party may petition FERC for rehearing and then petition for judicial review of FERC order within 60 days). This is exactly what the plaintiffs did to obtain review of FERC's PURPA rules in *API.*

**40.** The APA provides general authorization for review of agency action, but it "does not duplicate the previously established special statutory procedures relating to specific agencies." *Bowen v. Massachusetts,* 487 U.S. at 903, 108 S.Ct. 2722. There is a general six-year statute of limitations for civil actions

against the United States found in 28 U.S.C. § 2401(a), which applies to lawsuits brought pursuant to the APA. *See Polanco v. U.S. Drug Enforcement Admin.,* 158 F.3d 647, 652 (2d Cir.1998).

**41.** There, the court held that an aggrieved party may obtain judicial review of agency regulations after the statutory time limit restricting judicial review by petitioning the agency for amendment or recission of the regulations and appealing the agency's decision. *See* 834 F.2d at 195.

sufficient over time to compensate the utility for contract payments it is required to make in the face of the power industry's tumbling energy prices.

■ Nevertheless, assuming without deciding, that the previous availability of direct judicial review of the regulations and orders which now constrain NYSEG does not preclude the *possibility* of APA review, NYSEG must still demonstrate that this Court has jurisdiction to review the order at issue. Saranac and Lockport argue that FERC's decision to deny NYSEG's administrative petition was merely a non-enforcement determination and is unreviewable as a matter of law pursuant to *Heckler v. Chaney.* Indeed, the Court stated therein that "an agency generally cannot act against each technical violation of the statute it is charged with enforcing." 470 U.S. at 831, 105 S.Ct. 1649.

NYSEG concedes in one portion of its memorandum of law that FERC's denial of its petition, insofar as it requested FERC to direct PSC to take action, may be unreviewable to the extent that it is considered a decision by FERC not to take enforcement action against PSC. However, NYSEG also argues in the alternative that PURPA contains "meaningful standards" by which FERC's failure to act against PSC can be measured inasmuch as the statute prohibits rates in excess of avoided costs. As noted by Saranac, PURPA is not self-implementing, it is a "regulatory statute," *see API*, 461 U.S. at 417, 103 S.Ct. 1921, which takes meaning and authority from its attendant regulations. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." In such case "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.").

Because Congress merely announced the goal of promoting the development of alternative energy sources in PURPA and left the details of how to do so to FERC, it cannot be said that PURPA provides "meaningful standards for defining the limits" of FERC's enforcement discretion. *Heckler v. Chaney*, 470 U.S. at 834, 105 S.Ct. 1649. PURPA's prohibition against enactment of rules which require a utility to pay more than avoided costs for purchases is simply insufficient to meet this standard. Thus, NYSEG is not entitled to APA review of FERC's determination not to take enforcement action against PSC.

■ NYSEG alleges, however, that its claims against FERC are more broad. To wit, it seeks APA review of FERC's announcement of the "continuous challenge rule" in the context of denying its administrative petition. NYSEG is correct in asserting that generally, agency "rule[s]" must be subjected to a notice and comment period before taking effect. 5 U.S.C. § 553. An agency such as FERC which promulgates a new rule "without observance of procedure required by law" has violated the APA. 5 U.S.C. § 706(2)(D). However, the notice and comment provisions of Section 553(b)(A), do not apply "to interpretive rules [or to] general statements of policy." *Zhang*, 55 F.3d at 745. The distinction between legislative and interpretive rules is sometimes difficult to apply:

> In distinguishing between the two types of rules, the central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties in what amounts to a legislative act. Since legislative rule-making involves [an] agency's delegated power to make law through rules, it is subject to the public participation and debate that notice and comment proce-

dures provide. Legislative rules have the force of law.... Interpretive rules, on the other hand, do not create rights.... A rule is interpretive ... if it attempts to clarify an existing rule but does not change existing law, policy, or practice.

*Id.* (internal quotations and citations omitted). No fair view of FERC's explanation that, as an alternative basis for denying NYSEG's underlying petition, it would not invalidate PURPA contracts which had not been challenged from the outset could characterize it as "legislative." FERC neither created nor denied new rights, law or policy with this statement. Indeed, it is clear that the alleged "continuous challenge rule" is no more than FERC's reiteration of its "general policy 'against invalidating contracts for which a PURPA-based challenge was not timely raised—

that is, before the contracts were executed,' so as not 'to upset the settled expectations of parties to, and to invalidate any of their obligations and responsibilities under, such PURPA sales contracts." *Connecticut Valley Elec. Co. v. FERC,* 208 F.3d 1037, 1046 (D.C.Cir.2000) [42] (quoting *Connecticut Valley Elec. Co. v. Wheelabrator Claremont Co.,* 82 F.E.R.C. ¶ 61,116, at 61,419–20, 1998 WL 64136 (1998)). FERC "reasonably infers the parties' settled expectations from the terms of their contract; either party may avoid such an inference by including a specific reservation in its contract or by challenging the validity of a contract provision at the time it executes the contract." *Id.* FERC's application of its "general rule inferring the settled expectations of the parties to a contract from the terms of their agree-

---

**42.** There, the plaintiff electric utility ("Connecticut Valley") sued FERC after the Commission refused to take action on its petition to revoke the QF status of Claremont, a small power producer ("SPP"), from whom it was obligated to purchase energy pursuant to a PPA. Claremont was selling its "gross" electrical output to Connecticut Valley utility which is "all electricity produced by the facility," as opposed to its "net" output which is gross output less the electricity used by Claremont in its own operations. 208 F.3d at 1040. Claremont purchased the power required for its internal operating needs directly from Connecticut Valley at a tariffed rate. By selling its gross output to Connecticut Valley at full avoided costs, Claremont was "in effect selling back at a significant markup the quantum of electricity it purchased from the utility for its internal operating needs." *Id.* This resulted in Connecticut Valley paying more than its avoided costs for the difference between Claremont's net and gross output.

Section 3 of the FPA prohibits a SPP from obtaining QF status if it is "engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or SPP facilities)." 16 U.S.C. § 796(17)(c)(ii). Since SPPs in Claremont's position were selling electric power which they purchased directly from utilities, they were no longer "not primarily engaged" in the sale of non-alternatively produced electricity. FERC determined in a 1991 decision that under Section 3(17)(C)(ii) of the FPA, an SPP which sells more than its net output of energy cannot be a QF. *See Turners Falls, Ltd.*

*Partnership,* 55 F.E.R.C. ¶ 61,487, at 62,668, 1991 WL 266430 (1991).

Based on this decision, Connecticut Valley petitioned FERC in 1993 to revoke Claremont's status as a QF, take jurisdiction over its PPA with Claremont pursuant to Sections 205 and 206 of the FPA, and either rescind the contract and retroactively determine just and reasonable rates for past sales or at least prospectively reform the contract to ensure it need only purchase Claremont's net output going forward. *Connecticut Valley,* 208 F.3d at 1041. FERC refused to revoke Claremont's QF status or provide alternative relief to Connecticut Valley because "not until *Turners Falls*" was it "clear that gross sales would violate § 3(17)(C)(ii) and thus preclude QF status." *Id.* at 1042 (citing *Connecticut Valley Elec. Co. v. Wheelabrator Claremont Co.,* 82 F.E.R.C., at 61,422, 1998 WL 64136). Because many QFs had in good faith entered into long-term contracts for the sale of their gross output, and "not wanting to upset their settled expectations," FERC adopted a remedial policy which was only partially retroactive. *Id.* The Commission stated it would revoke the QF status of any facility which sold in excess of its net output pursuant to a contract entered into after the issuance of *Turners Falls. Id.* However, Connecticut Valley's PPA with Claremont was executed in 1987. *See id.* at 1041. Connecticut Valley sued asserting that FERC's refusal to act on its petition violated Section 210 of PURPA and Section 3 of the FPA and was an abuse of FERC's remedial discretion.

ment" was not a legislative action, but merely interpretive, and thus "not arbitrary or capricious" pursuant to the APA. *Id.* at 1047.[43]

■ NYSEG also claims that its APA claims against FERC are not barred by *Heckler v. Chaney* because it seeks review of both FERC's failure to order PSC to enforce PURPA in the context of NYSEG's PPAs with Saranac and Lockport and FERC's failure to take such action *itself* by way contractual or regulatory amendment. In the Court's view, whether it disputes FERC's failure to direct PSC to act or FERC's own failure to act, NYSEG's complaint clearly challenges FERC's failure to "enforce" PURPA's alleged rate cap, a matter reserved to the agency's remedial discretion and not reviewable under the APA. *Heckler v. Chaney*, 470 U.S. at 831, 105 S.Ct. 1649. Assuming, however, that there is a meaningful distinction between FERC's decision not to compel PSC to relieve NYSEG of its obligation to pay more than avoided costs for QF purchases and FERC's decision not to take such action itself, FERC's order does not violate the APA as a matter of law.

Under the APA, a party "aggrieved" by an agency must show the agency's action was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). At the outset, the Court questions whether PURPA even requires FERC to "enforce" PURPA in the manner asserted by NYSEG. According to NYSEG, the overriding purpose of PURPA was to ensure reasonable rates for electric consumers and rates not in excess of avoided costs for utilities. Thus, NYSEG argues that FERC's failure to cap NYSEG's payment to Saranac and Lockport at avoided costs is a failure to enforce PURPA.

■ The Supreme Court has disagreed with NYSEG's characterization of PURPA's core purpose, stating that the focus of Title II or Section 210 of PURPA is "to encourage the development of cogeneration and small power production facilities" by addressing "problems imped[ing] the development of non-traditional generating facilities." *FERC v. Mississippi*, 456 U.S. at 750, 102 S.Ct. 2126. "In other words, [Section 210] reflects, predominantly, solicitude for certain types of producers rather than for the consumers who must pay their rates." *Connecticut Valley*, 208 F.3d at *1044.* Thus, when NYSEG argues that Section 210 of PURPA requires FERC to ensure that PPA rates are just and reasonable and less than a utility's avoided costs, "it is correct only in the limited sense that the Commission is required to promulgate regulations to that effect." *Connecticut Valley*, 208 F.3d at 1043. "[FERC] satisfied that obligation when it promulgated 18 C.F.R. § 292.304(a)(2)" which limits PPA rates to a utility's avoided costs. *Id.* Likewise, when NYSEG asserts that FERC ignores PURPA by condoning PPA rates which exceed NYSEG's avoided costs, it is correct only in the sense that PURPA forbids FERC from creating rules which mandate that utilities pay more than avoided costs.

The Court disagrees with NYSEG's contention that PURPA requires FERC to take an active role in monitoring its regulations and QF contracts pursuant to

---

43. Even if this were not true, the "continuous challenge rule," to the extent it can be deemed legislative, was "announced" by FERC prior to resolution of NYSEG's underlying petition in *California*, 70 F.E.R.C., at 61,678 and in *CL & P*, where FERC stated: We will not entertain requests as a consequence of this order asking us to invalidate on this basis [preemption of state statute which purported to require PURPA PPA rates in excess of avoided costs] other, pre-existing contracts where the avoided cost issue could have been raised. The appropriate time to challenge a state-imposed rate is up to or at the time the contract is signed, not several years into a contract which heretofore has been satisfactory to both parties. *CL & P*, 70 F.E.R.C., at 61,029, 1995 WL 9931. Thus, the rule was not new as applied to NYSEG nor was it appealed or challenged after *California* or *CL & P*.

PURPA to ascertain no utility pays more than avoided costs for purchases. FERC fulfilled its obligations under PURPA when it promulgated rules to "encourage cogeneration . . . which rules require electric utilities" to offer to buy electric energy from and sell electric energy to QFs. 16 U.S.C. § 824a–3(a). FERC fulfills its continuing obligations under PURPA by "revis[ing]" the rules "from time to time" as necessary to accomplish these purposes. *Id.* Consequently, FERC's refusal to modify or waive its rules retrospectively to ascertain that NYSEG, an electric utility, is not disadvantaged by a PURPA contract is not a refusal to "enforce" PURPA. FERC's failure to act on NYSEG's petition—to the extent that NYSEG asked FERC to take direct action to relieve it from the alleged illegal rates in the Saranac and Lockport contracts—may be characterized simply as refusal to do more than it was required to do by statute, that is, implement and periodically revise regulations to encourage cogeneration. As such, FERC's actions did not exceed its authority or act in contravention of the law when it declined to "enforce" PURPA in the manner requested by NYSEG.

In *Connecticut Valley*, the plaintiff utility made the same arguments that NYSEG makes here, that is, Section 210(b) of PURPA expressly requires FERC to "balance the interests of consumers against those of producers" and ensure PPA rates do not exceed a utility's avoided costs. 208 F.3d at 1045. Connecticut Valley argued there, as NYSEG does here, that FERC's failure to do so violated PURPA, the FPA and the APA. The court disagreed, noting that FERC's only obligations under Section 210 of PURPA were to promulgate and periodically revise its regulations. *Id.* at 1043. Thus, FERC's refusal to rescind Claremont's QF status or reform the contracts which allowed Claremont to collect more than Connecticut Valley's avoided costs for the facility's gross output "[could] not be a violation of § 210 [of PURPA]." *Id.* Rather, FERC's decision not to take any action in response to Claremont's ap-

parent violation of § 3(17)(C)(ii) was merely an "announcement of the position it would take in any future enforcement action that [Connecticut Valley] might bring, . . . namely that it will not seek to remedy violations of § 210 arising from [the SPP's] sale of gross output under a contract entered into prior to [FERC's] decision in *Turners Falls*[,1991 WL 501859]." *Id.*

■ The Court also determined that FERC's "grandfathering" of Claremont's PPA with Connecticut Valley in the face of the clear language of the FPA which disqualifies any QF which sells more than its net output was within its discretion. "The breadth of agency discretion is, if anything, at [its] zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies, and sanctions." *Id.* at 1044 (quoting *Niagara Mohawk Power Corp. v. Federal Power Commission*, 379 F.2d 153, 159 (D.C.Cir.1967); *Louisiana Pub. Serv. Comm'n v. FERC*, 174 F.3d 218, 225 (D.C.Cir.1999)). "In other words, the Commission ordinarily has remedial discretion, even in the face of an undoubted statutory violation, unless the statute itself mandates a particular remedy." *Id.* (citing *Towns of Concord, Norwood & Wellesley v. FERC*, 955 F.2d 67, 72–73 n. 8 (D.C.Cir.1992) (FERC's refusal to refund rates charged by utility in excess of filed rates within agency's remedial discretion despite towns' argument that their right to be charged no more than filed rates pursuant to FPA "ceased to exist" unless "backed up by a remedy" and FERC's refusal to order refunds was tantamount to authorizing utility to violate FPA's "filed rate doctrine")).

Finally, the Court found in *Connecticut Valley* that FERC did not abuse its remedial discretion pursuant to the APA by deciding not to revoke Claremont's QF status or provide any alternative relief since the relevant statutory purpose of PURPA was to "encourage the develop-

ment of non-traditional generating facilities." 208 F.3d at 1045. The Court rejected Connecticut Valley's arguments that PURPA required FERC to consider the harm to consumers in declining to take action against Claremont because PURPA's requirement that "rates for purchases ... shall be just and reasonable to the electric consumers of the electric utility and in the public interest ..." finding this statutory provision was directed only to FERC's exercise of *rulemaking* authority over the rates utilities must pay QFs for power. *Id.* (quoting 16 U.S.C. § 824a–3(b)). Since the Supreme Court in *API* already determined that the full avoided cost rule satisfies the requirements of 16 U.S.C. § 824a–3(b), "[t]he Commission did not abuse its discretion when it omitted explicitly to consider anew the interests of consumers." *Id.* Thus, the Court finds NYSEG's claim that FERC's failure to act on its petition pursuant to its authority under PURPA and the FPA violates the APA is deficient as a matter of law.

■ Even if this were not true, FERC has no power—under either PURPA or the FPA—to revise, rescind or otherwise alter the force and effect of the Saranac and Lockport agreements. As discussed above, PURPA does not require or authorize FERC to take an active role in monitoring the rates in QF contracts to ensure they are "just and reasonable." 16 U.S.C. § 824a–3(b)(1).[44] Indeed, PURPA expressly exempts QFs from this very type of scrutiny associated with rate regulation under the FPA. *See* 16 U.S.C. § 824a–3(e).[45]

■ NYSEG recognizes as much in arguing that "FERC's regulations *currently* exempt QFs from FPA section 206, which directs FERC to modify contract rates if it determines that such rates are unjust and unreasonable." NYSEG Brief, p. 25 (emphasis in original). Nevertheless, NYSEG argues that FERC "can simply change its rules to effectuate Congress' intent to charge ratepayers only avoided cost for QF power." *Id.* at p. 27. NYSEG cites a FERC decision in which the agency allegedly noted that "cogeneration no longer needs to be encouraged." NYSEG Brief, p. 27 (citing *California*, 70 F.E.R.C., at 61,675). According to NYSEG, utilities "have taken a back seat to independent power production." *Id.*[46] Thus, NYSEG argues PURPA's mandate that: 1) FERC

44. The Third Circuit noted in a footnote in *Freehold* that any problem arising from the competing "consumer protection provision of PURPA and the FERC regulation permitting parties to hold incremental avoided cost at the level it has on the date the PPA is effective" is "matter for FERC." 44 F.3d at 1191, n. 11. NYSEG contended during oral argument that this observation proves that even if state utility commissions do not have power to change PURPA contracts, FERC does. In spite of the Third Circuit's rather ambiguous suggestion that FERC is obligated to or may resolve the "tension" which results from application of its regulations, the Court disagrees that this statement paves the way for contract revision by FERC. The Third Circuit expressly held that "Congress intended to exempt [QFs] from state *and* federal rate regulations." 44 F.3d at 1192 (emphasis added).

45. In *API*, the Supreme Court held:

Simply on the basis of the statutory language, we would be reluctant to infer that

Congress intended the terms "just and reasonable," which are frequently associated with cost-of-service utility ratemaking, *see, e.g., NAACP v. FPC*, 425 U.S. at 666, 96 S.Ct. 1806, to adopt a cost-of-service approach in the very different context of cogeneration and small power production by nontraditional facilities. The legislative history confirms, moreover, that Congress did not intend to impose traditional ratemaking concepts on sales by qualifying facilities to utilities.
461 U.S. at 414, 103 S.Ct. 1921.

46. FERC's observations in connection with the success of PURPA in combating the problem of electric utilities' traditional refusal to purchase power from cogenerators are not quite this broad. In *California*, FERC recognized that due in large part to the full avoided cost rate mandated in PURPA contracts, "there is no longer any dominance in the provision of *new* generating capacity." 70 F.E.R.C., at 61,675, 1995 WL 9931 (emphasis in original).

"from time to time ... revise" [47] its rules; and 2) FERC's obligation to exempt QFs "in whole or part" [48] from FPA regulation as required "to encourage cogeneration," [49] provide the agency with the authority to modify its rules "to the extent necessary for FERC to make the rates in [the Saranac and Lockport] agreements comport with the 'just and reasonable' and avoided cost standards." NYSEG Brief, at p. 27, n. 42.[50]

■ The Court does not deem NYSEG's underlying petition as sufficient to invoke the rulemaking authority of FERC since NYSEG made no reference to Section 553(e) of the APA therein and its requests for modification or waiver of PURPA rules were "too situation specific and too informal" in that they merely requested FERC take action to relieve it of the Saranac and Lockport agreements. *South Hills,* 864 F.2d at 1084. To the extent that NYSEG's petition can be deemed one for rulemaking, FERC's refusal to reconsider its regulations was not violative of the APA.

■ Review of PURPA's legislative history as well as decisions of courts which have resolved disputes based on PURPA suggests that Congress could not have intended FERC to have the power to revisit its exemption regulations piecemeal on a QF by QF or PPA by PPA basis retrospectively. Thus while the PURPA language on which NYSEG relies might conceivably grant FERC authority to deem FPA exemption for QFs unnecessary "in whole or part," in the context of general rulemaking proceedings to amend its 1980 regulations, it cannot be reasonably read to authorize FERC to withdraw FPA exemption from individual QFs thereby invalidating rate terms in existing purchase contracts. Nor could FERC revoke FPA exemption from all QFs in a general rulemaking and then apply the revised rules retroactively to the Saranac and Lockport agreements. Such action by FERC would fly in the face of PURPA's core purpose which is to encourage cogeneration.

■ Moreover, retroactive rulemaking by an agency is prohibited unless Congress expressly conveys this power. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. at 208, 109 S.Ct. 468. PURPA's prohibition against enactment of rules which require a utility to pay more than avoided costs for purchases is simply insufficient to overcome the presumption against retroactive rulemaking. *See Landgraf v. USI Film Products,* 511 U.S. 244, 269–70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (although statute does not operate retrospec-

47. 16 U.S.C. § 824a–3(a).

48. 16 U.S.C. § 824a–3(e).

49. *Id.*

50. The Court notes preliminarily FERC's argument that NYSEG's challenge to FERC's failure to initiate a rulemaking is premature since NYSEG did not file a petition for a rulemaking pursuant to Section 553(e) of the APA. A "threshold requirement of seeking judicial review of an agency's refusal to undertake rulemaking is the filing of a rulemaking petition with the relevant agency." *South Hills,* 864 F.2d at 1095. Failure to file such a petition deprives a court of subject matter jurisdiction to review the claim. *Id.* NYSEG conceded at oral argument that it did "not cite the specific sections of the APA" related to rulemaking in its petition, but contended that it did request "revision or waiver" of the rules throughout the petition. Review of NYSEG's underlying petition reveals "it is not a petition for review of an order by [FERC] refusing to reexamine the continuing validity of [FERC's avoided cost and QF exemption regulations] ... nor is it an appeal from denial of a petition to eliminate specific regulations on demonstrable grounds of invalidity." *Id.* Rather, the petition sought a declaratory order, reformation of the QF contracts and "waiver" of FERC's rules to the extent necessary to provide NYSEG with relief from existing long-term PPAs. In *South Hills,* the court rejected plaintiff's claim that it had sufficiently engaged the rulemaking authority of the defendant agency by asking it to "reevaluate" Freedom of Information Act regulations in the context of deciding its request to opt out of releasing Medicare cost reports. The court found that this request was "too situation specific and too informal" to constitute a request for reconsideration of a rule pursuant to 5 U.S.C. § 553(e). *Id.* at n. 10.

tively simply because it "upsets expectations based in prior law," every statute which takes away or impairs vested rights acquired under existing law is impermissibly retrospective) [51]

■ Contrary to NYSEG's arguments, retroactive rulemaking is not authorized here based on the patent "illegality" of: 1) 18 C.F.R. § 292.304(b)(5) which allows Saranac and Lockport to collect a rate in excess of avoided costs because it is based on estimated LRACs in a long-term PPA; and 2) the PPA rates themselves because QFs have no "vested interest" in rates which violate PURPA. As discussed above, FERC's regulations, which account for and forgive a rate in excess of avoided costs in NYSEG's very circumstances, are not illegal and QFs are entitled to rely on purchase rates in long-term PPAs even if they violate PURPA's rate cap. *See Connecticut Valley*, 208 F.3d at 1043–44; *Indep. Energy Producers Assoc., Inc. v. California Public Utilities Comm'n*, 36 F.3d 848, 858–59 (9th Cir.1994) (*"IEP"*) (federal regulations provide that QFs are entitled to "lock in" energy sales at an avoided cost rate calculated at the time the contract is signed even if the utilities' avoided costs are lower than estimated at the time the energy is delivered); *Smith Cogeneration Management, Inc. v. Corp. Comm'n*, 863 P.2d 1227, 1240 (Okla.1993) (cogenerator which chooses to set purchase rate based on avoided costs in long-term PPA as estimated at time contract is signed is entitled to receive benefits of contract even if, due to changed circumstances, contract price for power at time of delivery is unfavorable to utility).

In sum, this Court is without subject matter jurisdiction to entertain any of NYSEG's claims against FERC.[52]

### 3. *Statute of Limitations*

■ Assuming any of NYSEG's claims is not fatally flawed by an absence of subject matter jurisdiction, FERC, along with Saranac and Lockport, also argue that NYSEG's action should be dismissed on statute of limitations grounds since the utility failed to seek review of FERC's avoided cost rules at the time they were promulgated in 1980. According to Saranac and Lockport, an aggrieved party has sixty (60) days to petition for judicial review of a final order of FERC under the FPA [53] and/or six (6) years to challenge an agency rule under the APA. *See Blassingame v. Secretary of Navy*, 811 F.2d 65, 70 (2d Cir.1987) (six-year statute of limitations applied to suits under APA which contains no statute of limitations). Saranac and Lockport argue that the time periods under either Act started running when FERC issued its PURPA regulations in 1980.

NYSEG responds that: 1) its claim against FERC was not ripe in 1980 when the regulations were promulgated because it did not know at that time that it would enter into the Saranac and Lockport PPAs based on estimated LRACs which would

---

**51.** *DIRECTV, Inc. v. Federal Communications Comm'n ("FCC")*, 110 F.3d 816 (D.C.1997), cited by NYSEG in support of its contention that an agency can undo existing contract rights by way of retroactive rulemaking is inapposite. The plaintiffs in that case, who had invested millions of dollars based FCC's stated intention to allocate reclaimed direct broadcasting channels on pro rata basis, had no vested contractual, statutory or regulatory right in these channels. Thus, the FCC's subsequent regulation, which resolved to distribute channels to highest bidder via auction, was not retroactive or "secondarily retroactive." 110 F.3d at 826.

**52.** The Court disagrees with NYSEG's contention that in *NYSEG v. FERC,* the D.C. Circuit "assumed" that such jurisdiction lies in the district court when it determined it would "usurp the district court's role in [PURPA's] enforcement scheme" if it considered NYSEG's request that FERC revise its rules. 117 F.3d at 1477. However, even if the Circuit court did so conclude, the assumption of a jurisdictional basis where none lies is of no legal moment.

**53.** *See* 16 U.S.C. § 825*l*(b). A request for rehearing is a condition precedent for judicial review. *See id.* at § 825*l*(a).

eventually diverge "permanently" from its avoided costs; 2) it is not challenging the validity of the rules, only FERC's failure to reconsider them in light of changed circumstances which triggers a new statute of limitations; and 3) agency regulations that conflict with the statute from which they derive are always reviewable notwithstanding statutes of limitations. *See NLRB v. FLRA,* 834 F.2d at 196.[54]

FERC argues that NYSEG cannot avoid statute of limitations issues by claiming that its dispute against FERC was not "ripe" until now. Indeed, FERC asserts that its avoided cost rules were challenged by other parties at the time they were promulgated and the D.C. Circuit rejected a related "ripeness" argument. In *API,* FERC argued that the utilities' claims were not ripe for review because the avoided cost rule had not yet been applied and it was not clear that the regulation would lead to rates which exceeded avoided costs. The court held that since the FPA required a party to file a petition for review of a FERC order within 60 days, petitioners had standing to challenge the as yet unapplied rules prospectively. Indeed, the court found that if plaintiffs failed to pursue their remedies of judicial review then, they did so "at the peril of losing the right ever to challenge the validity of [FERC]'s regulations." *Id.* at 1232, n. 26. The Court finds that NYSEG has done just that insofar as review of FERC's regulations pursuant to the FPA. There is no legal authority for extending the FPA's limitation of 60 days for judicial review of FERC orders.

However, the APA's statute of limitations has been interpreted differently. The Court next addresses NYSEG's argu-

ment that the FPA's statutory time limit on judicial review does not bar its claim that "changed circumstances" obligates FERC to revise its rules pursuant to the APA. *Geller v. FCC,* 610 F.2d 973 (D.C.Cir.1979), relied on by NYSEG in this regard, is clearly distinguishable. There, the court found that the FCC's failure to consider the continued viability of cable television regulations which no longer served the public interest in denying plaintiff's petition for a new rulemaking was a violation of the APA. However, the Federal Communications Act at issue in *Geller* expressly confined FCC's rulemaking power to promulgating regulations which served the public interest. To wit, the Act stated FCC "must place the public interest above private interests in carrying out its duties." 610 F.2d at 980 (quoting Fed. Communications Act of 1934, 47 U.S.C. § 303(r)).

This differs drastically from the rulemaking power granted to FERC in Section 210 of PURPA whereby the agency is directed to prescribe rules which "encourage cogeneration." 16 U.S.C. § 824a–3(a). The legislative history of PURPA suggests that while Congress recognized that the full avoided cost rule would not directly provide any rate savings to electric utility consumers, it deemed it "more important that the rule could 'provide a significant incentive for a higher growth rate' of cogeneration and small power production, and that 'these ratepayers and the nation as a whole will benefit from the decreased reliance on scarce fossil fuels, such as oil and gas, and the more efficient use of energy.'" *API,* 461 U.S. at 415, 103 S.Ct. 1921 (quoting *Small Power Prod. and Cogeneration Facilities; Regs. Implement-*

---

**54.** In *NLRB v. FLRA,* the court stated:
[T]he statutory time limit restricting judicial review of [agency] action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further [agency] action applying it. For unlike ordinary adjudicative orders, ad-

ministrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity.
834 F.2d at 195–96 (quoting *Functional Music v. FCC,* 274 F.2d 543, 546 (D.C.Cir.1958)).

*ing Section 210 of [PURPA],* Order No. 69, 45 Fed.Reg. at 12222).

Moreover, review of the legislative history accompanying FERC's PURPA regulations indicates that the very risk about which NYSEG complains herein—that is, the danger that avoided cost estimates would differ from actual avoided costs over time and thus exceed a utility's avoided costs at the time of delivery of energy by QFs pursuant to a long-term PPA—was expressly identified and accounted for by FERC when it enacted the regulations in 1980. *See NYSEG,* 70 F.E.R.C., at 61,116 (citing *Small Power Prod. and Cogeneration Facilities; Regs. Implementing Section 210 of [PURPA],* Order No. 69, 45 Fed.Reg. at 12224, *FERC Statutes and Regs., Regs. Preambles 1977–1981,* at 30,880). Indeed, FERC specifically found that the regulation, which forgives rates based on estimated LRACS which exceed avoided costs in the case of a long-term PPA, was necessary to protect QFs' investments in the event of "changed circumstances." *Id.* Thus, NYSEG's identification of a self-styled "permanent" divergence between actual and estimated avoided costs can hardly be considered "changed circumstances" such to obligate FERC to consider this calculated risk anew.[55]

Even if this were not true, it is not at all clear, contrary to NYSEG's arguments,

that the nationwide energy crisis which prompted enactment of PURPA or circumstances in the electrical industry in particular have so changed as to require FERC to revisit those portions of its 1980 regulations which: 1) granted QFs the option of "locking in" PPA rates at LRACs estimated at the time contracts are signed; 2) excused PPA rates which differed from actual avoided costs at the time energy is delivered when estimates were used to set the rate in a long-term PPA; and 3) exempted QFs from regulation pursuant to the FPA. Certainly FERC's decision in *California*[56] and its "restructuring of the electric utility industry under FERC Order No. 888"[57] do not mandate such a result. Even if Order No. 888 was somehow applicable to NYSEG's relationships with Saranac and Lockport, it was not issued until more than one year after FERC denied NYSEG's underlying administrative petition. Thus, FERC could not have considered Order No. 888 insofar as granting relief to NYSEG based on "changed circumstances."

NYSEG's final argument in connection with statute of limitations is that it can raise a claim that a regulation conflicts with its authorizing statute at any time relying principally on *NLRB v. FLRA.* There, the court recognized the right to obtain review of agency regulations "by

55. Indeed, the Court in *IEP* found that the "proper remedy for such a situation is to ensure future standard offer contracts contain more flexible pricing mechanisms," 36 F.3d at 858, which PSC has done since the Saranac and Lockport agreements were signed. Moreover, FERC suggested that utilities such as NYSEG could get relief from the burdens of current contracts with rates higher than avoided costs by "buying out or buying down" such "agreements" in which case FERC would authorize recovery of such costs from consumers through wholesale ratemaking. *NYSEG,* 70 F.E.R.C., at 61,341.

56. *See infra* note 46.

57. NYSEG's reference to "Order No. 888" refers to FERC's order in *Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Pub-*

*lic Utilities and Recovery of Stranded Costs by Public Utilities and Transmitting Utilities,* 61 Fed.Reg. 21,540, FERC Stats. & Regs. 31,036 (1996). The Order opened the wholesale electricity market and directs public utilities to open their transmission lines to competitors. The Order entitles electricity consumers to purchase power from entities other than public utilities but requires utilities to transmit the power, even if purchased elsewhere, over their own lines. The Order also allows utilities to recover stranded costs, that is, costs associated with serving customers who use open access to shift to another power supplier. The Order does not in any fashion address the issue of PURPA contracts, PPA rates set at full avoided costs or QF entitlement to FPA exemption.

# 240

petitioning the agency for amendment or recission of the regulations and then ... appeal[ing] the agency's decision." 834 F.2d at 196.[58] The court distinguished three types of challenges on appeal. First, a plaintiff's contention that a regulation suffers from some procedural infirmity "will not be heard outside of the statutory limitations period." *Id.* NYSEG's claims against FERC do not not allege procedural failures in prescribing PURPA regulations.

The second type of claim is that agency regulations "suffer from some substantive deficiency other than the agency's lack of statutory authority" to issue them. *Id.* Such a claim may be brought by petitioning the agency for amendment or recission of the rules and then appealing denial of the petition. *See id.* Denial of a petition in these circumstances would be reviewable as a "final order" pursuant to the APA's arbitrary and capricious standard. *Id.* Of course, "review in cases of this kind ... is limited to the narrow issues as defined by the denial of the petition for rulemaking, and does not extend to a challenge of the agency's original action in promulgating the disputed rule." *Id.* (internal quotations and citations omitted).

As discussed previously, NYSEG characterizes its underlying administrative petition before FERC as one which sought a new rulemaking, but review of the petition reveals that NYSEG requested only modification or waiver of rules necessary to provide it alone with the specific relief it was seeking therein—namely, reformation or recission of the Saranac and Lockport PPAs. Thus, NYSEG is in an entirely different stead than the plaintiff union in *NLRB v. FLRA,* which sought a general prospective rulemaking to amend parallel

regulations which were allegedly inconsistent with the Federal Labor Relations Act. Here, NYSEG seeks retroactive revision or waiver of FERC rules which is clearly prohibited in the absence of specific Congressional intent. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. at 208, 109 S.Ct. 468. Consequently, FERC's denial of NYSEG petition for a "rulemaking," to the extent it can be so characterized, could not have been a violation of the APA.

■ NYSEG's final argument is that those portions of FERC's regulations which excuse PURPA purchase rates in excess of avoided costs in a long-term PPA and simultaneously exempt QFs from regulation pursuant to the FPA are *ultra vires* and therefore subject to challenge outside of the statutory limitations period. *See NLRB v. FLRA,* 834 F.2d at 196. Challenges of this type proceed under the APA provision which allows courts to set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). As discussed above, however, PURPA evinces Congress' intent that FERC not prescribe a *rule* which mandated a PPA rate in excess of avoided costs and FERC has never done so. That FERC permits a *rate* which exceeds avoided costs should its rules be utilized by a QF to lock in PPA rates over the course of a long-term contract is not violative of its statutory authority as evidenced by PURPA's core purpose and legislative history which designate encouragement of cogeneration as the statute's primary objective. Thus, NYSEG is precluded from attacking FERC regulations outside the FPA's statutory time limit of 60 days on

---

**58.** Saranac argues that NYSEG's reliance on *NLRB v. FLRA* is misguided because its holding as well as that of *Functional Music* and its progeny were severely limited by *National Mining Assoc. v. U.S. Dep't of the Interior,* 70 F.3d 1345 (D.C.Cir.1995). There, the court held that the petitioners could not challenge agency regulations on grounds known to them at the time the rule was adopted. 70

F.3d at 1350. However, this limitation was derived directly from statute involved in the case, the Surface Mining Control and Reclamation Act ("SMCRA"), which expressly limited judicial review of actions by the Secretary of the Interior to grounds arising *after* expiration of the statutory limitations period. *See id.* Neither PURPA nor the FPA contain such a limitation.

the basis that they conflict from the statute from which they derive.

Based on the foregoing, each of NYSEG's claims against FERC is untimely assuming they are not barred from the outset by lack of subject matter jurisdiction. The Court observes that NYSEG's concerns regarding the absence of a remedy against FERC and being victimized in a "regulatory run-around" are valid only in the sense that NYSEG has no *current* remedy against FERC. NYSEG clearly had a remedy against FERC at the time it prescribed the regulations at issue herein and could have petitioned FERC at any time for prospective amendment or waiver of those regulations which it neglected to do.

B. *Motions to Dismiss Counts II, III and IV (N.Y.SEG's Claims Against PSC)*

NYSEG conceded at oral argument before this Court that its "primary" claim herein is against FERC because it believes "those who issue the rules can change them." Nevertheless, NYSEG also lodges claims against PSC. NYSEG's second, third, and fourth causes of action allege that: 1) PSC has violated and continues to violate PURPA and FERC's rules implementing PURPA by establishing policies, enacting regulations and issuing orders which require NYSEG to incur illegal contractual obligations; 2) PSC violated and continues to violate the Supremacy Clause of the United States Constitution by permitting payments to QFs in excess of NYSEG's avoided costs; and 3) PSC has failed to comply with a regulation implementing PURPA in violation of Section

210(f). With respect to this claim, NYSEG seeks enforcement of FERC's regulations under PURPA as authorized by Section 210(h).

PSC, along with Saranac and Lockport, seek dismissal of these causes of action on eight grounds: 1) this Court lacks subject matter jurisdiction because review of PSC's action implementing PURPA lies exclusively with state courts; 2) NYSEG's present claims are barred by the doctrines of *res judicata* and collateral estoppel; 3) the statute of limitations has run on NYSEG's claims against PSC; 4) NYSEG's present claims against PSC are an impermissible collateral attack on agency action; 5) the Court is obligated to dismiss the complaint as a matter of equitable discretion, 6) the complaint is barred by the Tenth Amendment; 7) the complaint is barred by the Eleventh Amendment; and 8) PSC has no authority to modify a previously approved QF contract pursuant to the Third Circuit's holding in *Freehold.* *See* brief discussion at page 229 *infra.*

1. *Subject Matter Jurisdiction*

PSC, along with Saranac and Lockport, argue that state courts have exclusive jurisdiction over claims that a state regulatory agency such as PSC has failed properly to implement PURPA as evidenced by Section 210(g) which governs judicial review of orders by state power authorities implementing FERC regulations. *See* 16 U.S.C. § 824a–3(g)(1).[59] Thus, these defendants argue that this Court is without subject matter jurisdiction to consider NYSEG's Section 210(h) enforcement action against PSC.[60]

---

**59.** Section 210(g) of PURPA provides:

(1) Judicial review may be obtained respecting any proceeding conducted by a State regulatory authority.., for purposes of implementing any requirement of a rule under subsection (a) of this section in the same manner.., as judicial review may be obtained under section 2633 of this title.... 16 U.S.C. § 824a–3(g). Section 123(a) of PURPA, referenced therein, contains an express jurisdictional limitation over actions

arising under Title II of PURPA. *See* 16 U.S.C. § 2633(a). This Section deprives district courts of jurisdiction and bestows exclusive jurisdiction over such matters on state courts.

**60.** While the parties vigorously debate this Court's power to adjudicate NYSEG's enforcement action arising under PURPA Section 210(h), no party addressed the issue of subject matter jurisdiction in connection with

NYSEG argues this Court has subject matter jurisdiction based on FERC's opinion in *Independent Power Producers of New York, Inc.,* 80 F.E.R.C. ¶ 61,125, 1997 WL 426959 (July 30, 1997) *("IPPNY").* There, FERC allowed a cogenerator to challenge PSC's QF "monitoring" program because "[w]e have interpreted [Section 210(h)(2)(A) ] to encompass situations where State regulatory authorities are alleged to have promulgated regulations which are inconsistent with or contrary to the Commission's regulations." *IPPNY,* 1997 WL 426959, at * 4. Since NYSEG complains herein about PSC's inconsistency with both PURPA as well as FERC's regulations, it asserts the existence of district court jurisdiction pursuant to PURPA Section 210(h)(2)(A).[61]

■ According to PSC, Section 210(h) of PURPA, authorizing an enforcement action against a state agency in district court, applies only if the state agency has failed to act altogether in implementing PURPA.[62] According to PSC, since it did act by fully implementing PURPA, Section 210(g) applies. The Court can discern no such distinction in the statute. Rather, it is clear that section 210(g) of PURPA "applies only to review of proceedings ... designed to implement any requirement of rules promulgated by ... FERC pursuant to Section 210(a)." *Freehold,* 44 F.3d at 1184. Here, NYSEG is "essentially claiming that [PSC] is subjecting it to [PPA

rates]" precluded by · Section 210(b) of PURPA which governs rates for purchases from QFs by electric utilities. *Id.* at 1185. It appears to the Court that the jurisdictional limitations of Section 210(g) may not be relevant to an enforcement action arising under Section 210(h) of PURPA based on an alleged violation of Section 210(b). On the other hand, in challenging the rates in its contracts with Saranac and Lockport, NYSEG is in essence complaining about PSC's implementation of FERC's PURPA rules under Section 210(a). "Since the pleadings reasonably can be read to assert a claim that PSC's action or inaction is inconsistent with and preempted by section 210[(b)] of PURPA and FERC regulations promulgated thereunder," *Freehold,* 44 F.3d at 1185, the Court assumes jurisdiction over the fourth cause of action, NYSEG's enforcement claim against PSC.

■ With respect to the second cause of action, NYSEG alleges that PSC has violated PURPA by establishing policies, enacting regulations and issuing orders which require NYSEG to pay more than avoided costs for QF purchases. NYSEG also alleges that PSC has failed to change its policies, regulations and orders in violation of PURPA. However, the claim is based expressly on PSC's "implementation of PURPA and FERC's rules promulgated thereunder." NYSEG's Complaint ¶ 57. "[I]f a case concerns implementation pro-

---

either the second cause of action which alleges PSC's violation of PURPA and its implementing regulations or the third cause of action which asserts a Supremacy Clause violation.

61. Of course in *IPPNY,* while FERC determined that the plaintiff cogenerator had properly invoked its jurisdiction to decide a dispute with a public utility commission, the agency did *not* decide, nor could it, that federal court was a proper forum for obtaining judicial review of state regulation alleged to be inconsistent with PURPA.

62. Section 210(h)(2)(B) provides that

Any electric utility.., may petition the Commission to enforce the requirements of sub-

section (f) of this section as provided in subparagraph (A) of this paragraph. If the Commission does not initiate an enforcement action under. subparagraph (A) against a State regulatory authority.., within 60 days following the date on which a petition is filed under this subparagraph ..., the petitioner may bring an action in the appropriate United States district court to require such state regulatory authority.., to comply with such requirements, and such court may issue such injunctive or other relief as may be appropriate.... .

16 U.S.C. § 824a–3(h)(2)(B). Section 210(f), which is referenced in Section 210(h)(2), requires the state regulatory authority to make rules implementing the FERC's rules for regulated utilities in that state. *See* 16 U.S.C. § 824a–3(f).

cedures contemplated by Section 210(f), then the action is properly covered by Section 210(g), and therefore, federal jurisdiction [is] improper." *Freehold,* 44 F.3d at 1192. Thus, the Court is without subject matter jurisdiction to consider NYSEG's second cause of action.

Finally, the Court notes that NYSEG's third cause of action against PSC for violation of the Supremacy Clause [63] of the United States Constitution triggers federal question jurisdiction pursuant to 28 U.S.C. § 1331. *See Freehold,* 44 F.3d at 1184.

## 2. *Res Judicata and Collateral Estoppel*

 PSC, along with Saranac and Lockport, argue that since NYSEG did not appeal the orders which set NYSEG's LRACs and approved the QF contracts at issue herein, those orders are entitled to preclusive effect and bar NYSEG's present claims against PSC. Claim preclusion or *res judicata* dictates that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). This holds true even when "several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts or would call for different measures of liability or different kinds of relief." *See Smith v. Russell Sage College,* 54 N.Y.2d 185, 192–93, 445 N.Y.S.2d 68, 429 N.E.2d 746 (1981) (even if there are variations in facts alleged or relief sought, separately stated causes of action may nevertheless be grounded on same "gravamen of the wrong upon which the action is brought"). Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of

action involving a party to the first case. *See Allen,* 449 U.S. at 94, 101 S.Ct. 411.

 Under the full faith and credit doctrine, federal courts must accord final judgments of state courts the same preclusive effect such judgments would have in the state courts. *See* 28 U.S.C. § 1738. In New York, issue preclusion may arise from the quasi-judicial determinations of administrative agencies. *See Allied Chemical v. Niagara Mohawk Power Corp.,* 72 N.Y.2d 271, 276, 532 N.Y.S.2d 230, 528 N.E.2d 153 (1988) (PSC adjudicatory determination that new tariff was not "applicable rate" for "old capacity cogenerator" under PURPA contract was dispositive of cogenerator's subsequent state court action to obtain full avoided cost for utility purchases). PSC argues that NYSEG raised the issue of the validity of the LRACs and the necessity for a "true-up" or estimated versus actual avoided cost reconciliation mechanism provision in the PSC contract approval proceedings. PSC argues that it accounted for the fallibility of the estimated LRACs by setting the Saranac and Lockport PPA rates at a substantial discount and thus rejected the notion that NYSEG was entitled to a protective reconciliation mechanism. According to PSC, these unappealed administrative orders are quasi-judicial and entitled to preclusive effect. *See Allied Chemical* 72 N.Y.2d at 277, 532 N.Y.S.2d 230, 528 N.E.2d 153

NYSEG's response is two-fold. First, it argues that it never raised and could not have raised the issues it complains of today before either FERC or PSC at the time the relevant regulations and orders in this case were finalized. According to NYSEG, its speculation that LRAC estimates would prove ineffective in ensuring PURPA's statutory cap was mere "conjec-

---

**63.** According to the Supremacy Clause, the U.S. Constitution and the laws passed pursuant to it are the "supreme laws of the land, binding alike upon the states, courts and the people, anything in the Constitution or Laws of any state to the contrary notwithstanding."

*Testa v. Katt,* 330 U.S. 386, 390, 67 S.Ct. 810, 91 L.Ed. 967 (1947). NYSEG alleges that PSC violated the Supremacy Clause by permitting payments in excess of avoided costs in its implementation of PURPA.

ture." NYSEG contends that the "reasonableness of [PSC's] method for assuring PURPA's statutory rate ceilings is a far different question" than whether the rates in the Saranac and Lockport agreements "in fact" exceed NYSEG's avoided costs. The Court is not persuaded by NYSEG's attempt to distinguish its legal position today from its legal position in 1982 when PSC set estimated LRACs and in 1989 when the QF agreements were ordered via formal PSC proceedings. It is apparent that FERC, PSC, NYSEG, Saranac and Lockport were always aware of the risk that NYSEG might find itself in the very circumstances confronting it today. It is only the degree to which the risk has manifested itself that is new.[64]

NYSEG's reliance on *Alabama Elec. Coop., Inc. v. FERC*, 684 F.2d 20, 25 (D.C.Cir.1982), for the proposition that a party is "not prevented from objecting to being struck by a car simply because he raised no earlier objection to having been hit by a bicycle" is misplaced. There, the court found that plaintiffs were not precluded from challenging an increased disparity in rates of return as between rural electric distribution cooperatives and municipal electrical distribution systems effected by a revised rate design proposed by an electric utility because they had failed to complain about a smaller disparity worked by the original rate proposal. The court noted that in 1974 when the original rates were published, the .017 percent difference between the rates of return for rural as opposed to municipal electrical distributors "was considered by the parties to be a minor, unobjectionable disparity." 684 F.2d at 24. "An unacceptable difference in the rate of returns was simply not an issue until late 1979 when Alabama Power first proposed a new rate design as part of its compliance filings." *Id.* at 25. Thus, the court reasoned that the "car" by which plaintiffs claimed to have been hit,

that is a 0.45 percent disparity caused by alterations to the utility's rate proposal, "did not exist" until the proposed rates were revised in 1979 at which time plaintiffs immediately objected. *Id.* at 25, n. 18.

These circumstances differ dramatically from those at bar where the risk that estimated LRACs would differ from NYSEG's actual avoided costs over the life of the Saranac and Lockport agreements not only existed, but was recognized and reconciled by the parties in the form of a discounted PPA rate, at the time the contracts were signed. NYSEG is now foreclosed from protesting a tide that turned more than anticipated. Indeed, the court in *Alabama Electric* would have required "good faith objections to *projected effects*" of proposed rates to be raised in the course of FERC rate-setting proceedings. *Id.* at 25 (emphasis added).

■ NYSEG's second argument in connection with issue and claim preclusion is far more compelling. To wit, NYSEG asserts that *res judicata* and collateral estoppel do not apply to PSC's determination of the rates in PURPA contracts because "ratemaking is a legislative and not a judicial activity." Indeed, prospective ratemaking, although it often employs quasi-judicial methods of adjudication, does not have preclusive effect because "the reasonableness of a rate depends upon economic conditions, and numerous policy considerations, all of which invariably change over time, requiring that a utility's rate be susceptible to reconsideration." *Allied Chemical*, 72 N.Y.2d at 278, 532 N.Y.S.2d 230, 528 N.E.2d 153.

As noted by Judge Pooler when she heard oral argument in this matter, there is scant case law available to guide the Court in deciding whether orders of public utility commissions which govern PURPA contracts are judicial or legislative in na-

---

**64.** In connection with this issue, Saranac and Lockport argue that NYSEG's claims about "permanent" divergence are illusory. According to these defendants, there is no proof that the rates are off by as much as NYSEG claims. Furthermore, they assert that NYSEG's present claim is based on estimates of divergence which may change over time.

ture. In *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), where the Supreme Court examined state sovereignty in connection with nationwide implementation of the Brady Handgun Violence Prevention Act, Justice Scalia suggested, albeit in dicta, that PURPA did not unconstitutionally "commandeer" state governments, but merely "imposed preconditions to continued state regulation of an otherwise pre-empted field ... and required state administrative agencies [such as PSC] to apply federal law while acting in a *judicial capacity*." 521 U.S. at 929, 117 S.Ct. 2365 (emphasis added).[65]

Review of PSC's *Opinion and Order Adopting Long–Run Avoided Costs for Major Elec. Utils.*, reveals that prior to establishing PURPA contract rates for QFs based on utilities' estimated LRACS, PSC: 1) published notice of its intent to do so; 2) solicited comments from both utility and non-utility parties; 3) "in lieu of formal administrative litigation" conducted "technical meetings ... for the purpose of reaching agreements and identifying areas of disagreement;" 4) subjected the parties' submissions to questioning, discussion and analysis; 5) solicited further findings including additional data, supporting materials and explanations of previous submissions; 6) allowed the parties to submit objections to its staff report which were considered by the Administrative Law Judge ("ALJ") who decided the matter; and 7) allowed the parties to lodge excep-

tions to the ALJ's report. Furthermore, each interested party to PSC's proceedings was represented by counsel as reflected in its final order.

In proceedings such as this, there necessarily arises a controversy since, in setting purchase rates, PSC is arguably acting legislatively, yet the procedures by or through which it reaches this result appear judicial or quasi-judicial in nature. *See People ex rel. Joline v. Willcox*, 129 A.D. 267, 113 N.Y.S. 861, 864 (1st Dep't 1908).[66] It strikes the Court that when PSC set PURPA contract rates by soliciting, discussing and analyzing "theoretical and methodological issues related to the calculation of LRAC estimates," *Opinion and Order Adopting Long–Run Avoided Costs for Major Elec. Utils.*, PSC Opinion No. 88–13, at p. 2, 1988 WL 391447, it may indeed have been acting in a quasi-judicial capacity even though traditional ratemaking is generally a legislative function.

In the case of approving the QF contracts, however, PSC's procedures were far less elaborate. The agency made its determinations based on: 1) petitions from both Saranac and Lockport which asked PSC to direct NYSEG to enter into long-term PPAs under certain terms; 2) NYSEG's reply to each petition; 3) each QF's response to NYSEG's reply; and 4) NYSEG's surreply to each QF response. Thus, even if PSC acted judicially when it established PURPA contract rates, the Court cannot state that when PSC enter-

---

65. However, courts in other jurisdictions have found that when a public utility commission promulgates an order "under the guise" of its rulemaking authority, *res judicata* does not apply. *Cincinnati Bell Tel. Co. v. Pub. Util. Comm'n of Ohio*, 12 Ohio St.3d 280, 283, 466 N.E.2d 848 (1984) (where comments were simply filed for consideration by FCC with no hearings or expert testimony, FCC order was legislative as opposed to adjudicative in nature); *Consumers Power Co. v. Michigan Pub. Serv. Comm'n*, 226 Mich.App. 12, 572 N.W.2d 222, 231 (1997) (challenged aspect of PSC decision approving discount gas transportation rate contract between gas company and large customer was legislative, poli-

cy-making decision rather than adjudication of disputed issues of fact).

66. There, the court found that an order of PSC which determined proportionate shares of a joint rate to be allotted to competing street railway companies was quasi-judicial. PSC held formal hearings on "various days," the parties were represented by counsel, "evidence was taken, argument had and the matter submitted for determination of the commission." 113 N.Y.S. at 864. The acts of PSC were found to be judicial because it was required it to decide a controversy "by judicial methods, dependent upon evidence and the establishment of facts." *Id.*

tained Saranac's and Lockport's petitions for long-term contracts and expressly rejected NYSEG's requests for reconciliation mechanisms to track avoided costs in both cases that the procedures used by PSC "assured that the information presented to the agency were sufficient both quantitatively and qualitatively, ... as to permit confidence that the facts asserted were adequately tested, and that the issue was fully aired." *Allied Chemical*, 72 N.Y.2d at 276, 532 N.Y.S.2d 230, 528 N.E.2d 153. If the orders which directed NYSEG to enter contracts with Saranac and Lockport were the result of quasi-legislative activity on the part of PSC, they are not entitled to preclusive effect herein.

### 3. *Statute of Limitations*

■ The issue of preclusivity may be moot if NYSEG's claims against PSC are untimely. PSC, along with Saranac and Lockport, argue that NYSEG's complaint is barred on the ground of statute of limitations because under New York Civil Procedure Law, Article 78 proceedings to challenge agency action must be commenced within four months of final agency action. *See* N.Y.C.P.L.R. § 217. PSC promulgated LRAC regulations pursuant to PURPA in 1982 and approved the contracts in this case in 1989. Therefore, defendants argue that the statute of limitations is long expired.[67]

NYSEG reiterates that the challenges it makes now are not the same as those it could have made back then. Because of its alleged earlier inability to ascertain the facts underlying its challenge, NYSEG claims that its complaint was not justiciable when PSC issued the underlying orders. As discussed above, the Court rejects NYSEG's claims in this regard and agrees that NYSEG's unawareness of the degree to which the risk of inaccurate

LRAC estimates would affect its QF contracts over time is insufficient to excuse its failure to appeal PSC's orders.

NYSEG also argues that the Article 78 limitations period is not applicable to its PURPA enforcement claim against PSC because in *NYSEG v. FERC*, the D.C. Circuit specifically directed it to district court for an enforcement proceeding. *See*, 117 F.3d at 1476. The Court disagrees. In *NYSEG v. FERC*, the court did not hold that the district court had jurisdiction to decide NYSEG's claims in this case. Rather, the court simply noted that it had no jurisdiction *itself* to consider the matter in light of PURPA's enforcement scheme. The D.C. Circuit never decided or examined the jurisdictional defenses raised by PSC herein. The Circuit's reference to PURPA's statutory enforcement scheme carries no implication or inference that this Court or any district court has jurisdiction in fact over NYSEG's claims.

■ Finally, NYSEG argues that since a Section 210(h) enforcement proceeding to ensure that a state regulatory agency properly implements PURPA is a federal claim, it is governed by a federal, rather than state, statute of limitations.[68] However, it is well-settled that if Congress fails to include a statute of limitations in a statute, courts should—with few exceptions—impose a state limitations "most closely analogous" to the federal act in need. *See Reed v. United Transp. Union*, 488 U.S. 319, 323, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). An exception to this rule applies when application of a state limitations period would "frustrate or interfere with the implementation of national policies or be at odds with the purpose or operation of federal substantive law." *North Star Steel*, 515 U.S. at 34, 115 S.Ct.

---

**67.** As with subject matter jurisdiction, no party briefed the issue of statute of limitations in connection with NYSEG's Supremacy Clause claim or for that matter, distinguished between NYSEG's various causes of action against PSC in arguing the issue of timeliness.

**68.** Notably absent from NYSEG's memorandum of law is reference to the federal limitations period which it deems a "more appropriate vehicle for interstitial lawmaking." *North Star Steel Co. v. Thomas*, 515 U.S. 29, 35, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995).

1927 (internal quotation marks and citations omitted).

"This case falls squarely inside the rule, not the exception." *Id.* at 35, 115 S.Ct. 1927. Short of stating that a PURPA enforcement action "follows federal procedural requirements," NYSEG offers no alternative federal statute of limitations better suited to the objectives of Section 210(h) of PURPA and makes no case for choosing the exception over the rule. Moreover, no "practicalities of litigation" or competing federal interests compel this Court to "search beyond state law for a more analogous statute of limitations." *Id.* at 37, 115 S.Ct. 1927. Thus, the Court finds that NYSEG's Section 210(h) enforcement claim which is based on PSC orders establishing LRAC's and PURPA contract rates and directing NYSEG to enter the Saranac and Lockport PPAs, is time-barred based on N.Y.C.P.L.R. Article 78.[69]

 NYSEG's Supremacy Clause claim is premised on PSC's alleged viola-

tion of federal law—PURPA—in permitting PPA rates which exceed NYSEG's avoided costs. This, according to NYSEG constitutes "unlawful state regulation of the wholesale sale of electric power in interstate commerce, an area pre-empted by the FPA."[70] NYSEG's Complaint ¶ 60. It strikes the Court that a declaratory judgment action with its attendant six-year statute of limitations may be the appropriate procedural mechanism to resolve this type of claim, *see* N.Y.C.P.L.R. § 213(1),[71] but determination of when the applicable limitations period began to run, if ever, is troublesome based on the alleged continuing nature of the statutory and/or constitutional violation. The Court finds it unnecessary to pass on the merits of this issue (which was not raised by the parties in any event), since NYSEG's Supremacy Clause claim is subject to dismissal on separate grounds as discussed below.

**4. *Collateral Challenge to Agency Action***

In connection with defendants' related argument concerning collateral attacks,

**69.** The fact that NYSEG seeks injunctive relief insofar as "compelling" PSC to comply with PURPA and FERC's rules implementing PURPA in the context of its Section 210(h) enforcement action does not change this result. Although NYSEG has never petitioned PSC for such relief, nor has PSC ever issued an order, regulation or other final determination in connection with such relief, N.Y.C.P.L.R. § 217 still renders the PURPA enforcement claim untimely. "An article 78 proceeding may lie in the absence of a final determination where the relief sought is by way of prohibition or by way of mandamus to compel performance by an administrative agency of a duty enjoined by law." *Hamptons Hosp. & Med. Ctr., Inc. v. Moore*, 52 N.Y.2d 88, 96, 436 N.Y.S.2d 239, 417 N.E.2d 533 (1981). Since NYSEG alleges that PSC is constrained by federal law to ensure the rates in its contracts do not exceed avoided costs, the proceeding either sounds in prohibition against violating PURPA or is one "in the nature of mandamus to compel a nondiscretionary administrative act." *Id.* In either event, Article 78 "provides the complete arsenal of remedies" and thus supplies the relevant limitations period. *American Cyanamid Co. v. PSC*, 106 Misc.2d 275, 277, 431 N.Y.S.2d 336 (1980) (Article 78 appropriate

procedural vehicle where plaintiff "tests the action or inaction of a public officer ... whether by certiorari to review a discretionary act of the public official ... or by way of mandamus to enforce a clear legal right where the public official has failed or refused to perform a duty enjoined by law.").

**70.** Indeed, Congress can pre-empt the states completely in the regulation of retail sales by electricity and gas utilities and in the regulation of transactions between utilities and co-generators. *See FERC v. Mississippi*, 456 U.S. at 759, 102 S.Ct. 2126. In enacting the FPA, Congress subjected every owner of every electrical utility to the *exclusive* jurisdiction and regulatory power of FERC. *See* 16 U.S.C. § 824(a) & (e).

**71.** Of course, the Court is cognizant of the fact that to the extent that resolution of NYSEG's alleged rights might have been obtained in an article 78 proceeding, the applicable statute of limitations would still be four months even if the action is styled as one seeking declaratory judgment. *See Bd. of Educ. of the Altmar–Parish–Williamstown Cent. Sch. Dist. v. Ambach*, 49 N.Y.2d 986, 987, 429 N.Y.S.2d 167, 406 N.E.2d 1061 (1980).

the Court agrees that even if NYSEG's claims against PSC based on its prior orders are not barred on statute of limitations grounds, the present federal action which indirectly challenges the validity of the prior orders is impermissible because the New York legislature established a manner for directly challenging agency action via Article 78 proceedings. *See PSC v. Rochester Tel. Corp.*, 55 N.Y.2d 320, 325, 449 N.Y.S.2d 463, 434 N.E.2d 699 (1982) (when legislature establishes procedure for directly challenging agency action, party cannot circumvent said avenue with subsequent collateral attacks). NYSEG does not directly challenge this assertion in its memorandum of law but seems to argue that PSC acted outside the statutory authority of Section 210(f) of PURPA which directs state utility authorities to "implement" PURPA regulations by permitting PPA rates which exceed the avoided cost cap of Section 210(b).

█ It is well-settled that when an agency acts outside its jurisdiction or in a manner not authorized by statute, the rule against collateral attacks doesn't apply. *See Consol. Edison Co. of New York v. PSC*, 98 A.D.2d 377, 381, 471 N.Y.S.2d 684 (3d Dep't 1983), aff'd. as modified, 63 N.Y.2d 424, 483 N.Y.S.2d 153, 472 N.E.2d 981 (1984). Thus the Court finds that the rule against collateral attacks does not apply to NYSEG's Supremacy Clause claim.[72]

### 5. *Equitable Discretion*

█ PSC, along with Saranac and Lockport, also argue that this Court should dismiss NYSEG's claims against PSC based on equitable discretion, citing *Alabama Public Serv. Comm'n v. Southern Railway Co.*, 341 U.S. 341, 349, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) wherein the Supreme Court held that when ade-

quate state court review of state agency action involving "predominantly local factors" is available, intervention of a federal court is not necessary. However, the Court is not persuaded that this case is so concerned with the domestic policies of New York as to render the doctrine of equitable discretion applicable. Indeed, review of PURPA and its regulations reveals that quite the opposite is true.

PURPA and its implementing regulations establish "an extensive federal system to encourage and regulate the sale of electrical energy by QFs." *Freehold*, 44 F.3d at 1191. However, as referenced above, PURPA is not a self-sufficient body of federal law. PURPA amended the FPA and its Section 210(f) grants state regulatory authorities "power to *implement* the requirements of Section 210(a) and the relevant regulations." *Freehold*, 44 F.3d at 1191–92. A state regulatory authority complies with PURPA "by issuing regulations, resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules." *FERC v. Mississippi*, 456 U.S. at 751, 102 S.Ct. 2126. "The most that can be said is that . . . [PURPA] establishes a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Id.* at 767, 102 S.Ct. 2126.

By providing that states would implement PURPA by enactment of regulatory programs within prescribed guidelines, Congress "expressed its intention that state law provides the content of and operates as federal law." *Corcoran v. New York Power Auth.*, 202 F.3d 530, 538 (2d Cir.1999) (concluding that Congress in-

---

72. Indeed, the New York Court of Appeals recognized in *PSC v. Rochester Tel. Corp.*, that collateral attacks on agency action are sustainable on jurisdictional grounds. 55 N.Y.2d at 325, 449 N.Y.S.2d 463, 434 N.E.2d 699. If a litigant challenges the jurisdiction of a public service commission to act in particular circumstances, the action is not precluded for failure to have sought prior review of the agency's underlying administrative order. *See id.* (citing *People ex rel. Utilities Comm'n v. City of Loveland*, 76 Colo. 188, 230 P. 399 (1924)).

tended substantive rules for decisions under federal Price–Anderson Act would derive from laws of states where nuclear accidents occurred, unless such laws were inconsistent with Price–Anderson.). As such, the doctrine of equitable discretion does not obligate this Court to refrain from deciding the present dispute.

### 6. Tenth Amendment

The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution nor prohibited by it to the States, are reserved to the States, respectively, or to the people." U.S. Const., amend. X. Saranac argues that this Court cannot ignore New York's statute of limitations for claims against a state agency such as PSC without running afoul of the Tenth Amendment.[73] See Johnson v. Fankell, 520 U.S. 911, 919, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997) (state court need not provide interlocutory appeal of dismissal of qualified immunity defense although appeal would be available in federal court because "[t]he general rule bottomed deeply in belief in the importance of state control of state judicial procedure, is that federal law takes the state courts as it finds them.") (internal quotation marks and citation omitted). The Court finds that although the Tenth Amendment would preclude the Court from extending the statute of limitations in connection with NYSEG's enforcement claim (which the Court has already deemed untimely), it does not prohibit the Court from adjudicating NYSEG's Supremacy Clause claim which implicates principles of federal preemption.

### 7. Eleventh Amendment

PSC, along with Saranac and Lockport, argue that the Eleventh Amendment[74] bars this Court from adjudicating NYSEG's claims against PSC in federal court. See Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54–57, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (states' sovereign immunity from suit in federal court defeated only if state consents to suit or Congress unequivocally abrogates immunity pursuant to valid exercise of power). PSC contends that it has not waived its sovereign immunity and that PURPA does not abrogate state immunity to federal lawsuits.

NYSEG first points to FERC v. Mississippi, in support of its contention that since Congress could have preempted the entire field of utility regulation, but did not, its grant of some power to the states in this area subject to federal court review is not violative of the Eleventh Amendment. See 456 U.S. at 759, 102 S.Ct. 2126. However, in Seminole, the Supreme Court expressly rejected this very argument concerning Congressional abrogation of states' rights in PURPA, that is, that the Eleventh Amendment is not implicated because the act "grants the States a power that they would not otherwise have." 517 U.S. at 58, 116 S.Ct. 1114. According to the Court, "Eleventh Amendment Immunity may not be lifted by Congress unilaterally deciding that it will be replaced by grant of some other authority." Id. at 58–59, 116 S.Ct. 1114. Seminole expressly rejected the Court's prior decision in Pennsylvania v. Union Gas Co., 491 U.S. 1, 19–20, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), which held that the Interstate Commerce Clause gave Congress the Power to abrogate Eleventh Amendment Immunity. 517 U.S.

---

73. The Supreme Court rejected a Tenth Amendment challenge to PURPA in FERC v. Mississippi, 456 U.S. at 758–70, 102 S.Ct. 2126 holding that Congress did not impermissibly trench state sovereignty. The Court's approval of PURPA's regulatory scheme, however, did not extend to forcing state courts or agencies to abandon established procedural or jurisdictional limitations.

74. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const., amend. XI.

at 66, 116 S.Ct. 1114. Since PURPA was enacted under the plenary authority granted to Congress by the Commerce Clause, see *FERC v. Mississippi,* 456 U.S. at 758, 102 S.Ct. 2126, and since the Court in *Seminole* concluded that the Commerce Clause does not grant Congress the power to abrogate state sovereign immunity, this Court rejects NYSEG's suggestion that the Eleventh Amendment is not implicated in its federal suit against PSC based on PURPA.

NYSEG also argues that New York's choice to implement PURPA by regulating certain wholesale power transactions constitutes consent to suit under PURPA in federal court. However, the Supreme Court has stated that "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights." *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2229, 144 L.Ed.2d 605 (1999) (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). True waiver of a constitutional right is demonstrably an "intentional relinquishment or abandonment of a known right or privilege." *Id.* (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). "[C]ourts indulge every reasonable presumption against waiver" of fundamental constitutional rights. *Id.* (quoting *Aetna Ins. Co. v. Kennedy ex rel. Bogash,* 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937)).

■ The Supreme Court has expressly held that a state's participation in or agreement to administer a federal program does not constitute waiver of Eleventh Amendment immunity. *See Florida Dep't of Health and Rehabilitative Servs. v. Florida Nursing Home Assoc.,* 450 U.S. 147, 150, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (state's participation in federal Medicaid program through which federal government provides assistance for operation by state of system of public aid and agreement to abide by federal law in doing so is not sufficient to establish consent on part of state to be sued in federal courts).[75] Thus, the Court rejects NYSEG's contention that New York waived its sovereign immunity against being sued in federal court by agreeing to implement PURPA.

■ NYSEG also argues that since it seeks to prohibit PSC from violating the Supremacy Clause, Eleventh Amendment sovereign immunity does not apply to PSC. *See Burgio and Campofelice, Inc. v. New York State Dep't of Labor,* 107 F.3d 1000, 1006–07 (2d Cir.1997) (no Eleventh Amendment bar to suit by contractor to enjoin New York State Department of Labor from enforcing state's prevailing wage law on basis of federal preemption via ERISA where plaintiff sought only to prevent state from enforcing its own regulations in area of exclusive federal jurisdiction). NYSEG's complaint alleges that PSC's allowance of PPA rates in excess of its avoided cost is *ultra vires* PURPA and thus violative of the Supremacy Clause. In response to NYSEG's citation of *Burgio,* PSC simply circles back to its argument concerning state courts' exclusive jurisdiction over PURPA implementation

---

**75.** *U.S. West Communications Inc. v. TCG Seattle,* 971 F.Supp. 1365 (W.D.Wash.1997), relied on by NYSEG is inapposite since there, the court found Congress had expressly conditioned the state's participation in a interconnection agreement process under the federal Telecommunications Act on consent to federal judicial review of the state's participatory actions. *See* 971 F.Supp. at 1369. The Telecommunications Act stated that state regulatory action was reviewable in federal court and nowhere else. *See id.* Likewise, NYSEG's reliance on *Premo v. Martin,* 119 F.3d 764, 770 (9th Cir.1997), is misplaced since the Randolph–Sheppard Act at issue therein required states to submit to binding arbitration and provided for appeal and review of arbitration awards under the APA. Thus, the court concluded that by participating in the program the state had consented to enforcement suits in federal court. *See id.* In contrast, PURPA provides explicitly for state court review of state regulatory authorities' implementation of the Act and its attendant federal regulations. *See* 16 U.S.C. § 824a–3(g).

issues. However, as referenced above, NYSEG's Supremacy Clause argument widens the Court's analysis of PSC's action from mere implementation of PURPA to a question of federal preemption. Thus, the Eleventh Amendment is not a bar to NY-SEG's third claim for relief.[76]

8. *PSC's Ability to Alter Existing Contracts*

■ Although NYSEG's Supremacy Clause claim has withstood staunch jurisdictional attacks by PSC and the other defendants, it falls ultimately for failure to state a claim upon which relief can be granted. PSC, along with Saranac and Lockport, argue that PSC has no power to alter existing contracts pursuant to the regulatory exemptions granted to QFs via PURPA. Section 210(c) of PURPA required FERC to prescribe rules exempting QF's from the FPA and state utility-type regulation, *see* 16 U.S.C. § 824a–3(e)(1), which directive FERC fulfilled by promulgating 18 C.F.R. §§ 292.601–292.602, which exempt certain QFs, including Saranac and Lockport, from traditional utility-type regulation. The Third Circuit held that these provisions together with FERC's avoided cost regulations, preempt a state regulatory commission from modifying previously approved rates in a PPA to reconcile a significant decline in the utility's avoided costs, the very situation in which NYSEG now finds itself. *See, Freehold,* 44 F.3d at 1192 ("[T]here is specific federal statutory legislation, PURPA, that bars reconsideration of the prior approval of the PPA . . .").

And NYSEG's plight is not unique. Since enactment of PURPA, NYSEG is not the only utility which has found itself bound to PPA contracts which obligate it to pay more than avoided costs for purchases. Yet courts which have examined such predicaments have uniformly refrained from trenching upon Congress' explicit intent to advance the development of alternative energy producers, even if at the expense of traditional utilities and even if at the expense of ratepayers. *See Connecticut Valley,* 208 F.3d at 1045. In *Smith Cogeneration,* the Supreme Court of Oklahoma held that any attempt to revisit a cogeneration contract as a result of changed circumstances deprives QFs of the benefits of their bargain and imposes "utility-type" regulations on them in violation of Congressional intent. 863 P.2d at 1240. Likewise in *IEP,* the Ninth Circuit held that the fact that "prices for fuel, and therefore the Utilities' avoided costs are lower than estimated does not give the State and Utilities the right unilaterally to modify terms of the [PPA.]" 36 F.3d at 858. Indeed, "[f]ederal regulations provide that QFs are entitled to deliver energy to utilities at an avoided cost rate calculated at the time the contract is signed" even if the avoided cost rate in the contract is greater than the utility's avoided cost rate at the time of delivery. *Id.* at 858–59. Once a state regulatory authority approves a PPA on the ground that the rate therein is "consistent with avoided cost," any action by such agency to "reconsider its approval or deny passage of such rates" to a QF is "preempted by federal law." *Freehold,* 44 F.3d at 1194.

NYSEG argues that *Freehold* was wrongly decided because continuing oversight of PURPA contracts by a state agency such as PSC is not the "utility-type" regulation of QF's prohibited by PURPA, but is required to ensure that utilities are not charged more than avoided costs under the contracts. This oversight is required, NYSEG argues, to comply with PURPA's dictate that state commissions

---

**76.** Because the Court finds that the Eleventh Amendment does not bar NYSEG's Supremacy Clause claim against PSC, it need not consider the merits of NYSEG's invocation of the exception to sovereign immunity carved out by the Supreme Court in *Ex Parte Young* whereby the Court could enjoin the individual commissioners of PSC from enforcing an allegedly unconstitutional enactment. *See* 209 U.S. 123, 159, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

implement PURPA rules. 16 U.S.C. § 824a–3(f)(1). Such a contention stands the concept of QF exemption from rate regulation on its head. The Court finds that NYSEG's request that PSC modify its PPAs with Saranac and Lockport or take any other action with respect to these previously approved contracts is "exactly the type of regulation from which [the QFs] are immune under Section 210(e) [of PURPA.]" *Freehold,* 44 F.3d at 1192.

NYSEG also points to the D.C. Circuit's decision in *NYSEG v. FERC,* in which the court said:

> The failure of a state commission to ensure that a rate does not exceed a utility's avoided cost is a failure to comply with a regulation implementing the PURPA.... The alleged failure of the PSC to set the contested rates at NYSEG's avoided cost would ordinarily be challenged through an enforcement action brought in district court under § 210(h) ...

117 F.3d at 1476. NYSEG reads this statement as an assertion by the D.C. Circuit Court of Appeals that the PSC must continuously ensure that the rate charged a utility under a contract does not exceed avoided cost. Again, the Court disagrees. In the first instance, the D.C. Circuit did not reach the merits of NYSEG's contentions regarding PSC. Moreover, the Court finds no legal basis to conclude that PSC has a continuing obligation to monitor PURPA contracts or PPA rates after contract approval any more than FERC has a continuing obligation to do so after prescribing regulations designed to "encourage cogeneration." 16 U.S.C. § 824a–3(a). Indeed, FERC's regulations expressly state that PPA rates *do not violate* PURPA if they exceed avoided cost at the

time the power is delivered as long as they were determined to be equal to or less than avoided costs at the time the contract was signed. *See* 18 C.F.R. § 292.304(b)(5).

In short, the Supremacy Clause is not implicated by PSC's "permitting" rates which exceed avoided costs because PURPA's regulations expressly allow such rates in the case of long-term PPAs based on estimates of LRACs. Moreover, because PURPA and FERC's regulations implementing PURPA expressly exempt QFs from state rate regulation, PSC's failure to modify or otherwise interfere with the rates in the Saranac and Lockport PPAs is not a violation of federal law. Rather, such restraint is consistent with PURPA and its regulations in light of *Freehold.*

Based on the above, each of NYSEG's claims against PSC is deficient as a matter of law and subject to dismissal pursuant to Fed.R.Civ.P. 12.

### C. *Motions to Dismiss Counts V, VI and VII (N.Y.SEG's Claims Against the QFs)*[77]

█ In its fifth claim for relief, NYSEG alleges that the Saranac and Lockport PPAs are illegal under PURPA. The Court disagrees since, as discussed at length above, FERC regulations expressly forgive rates in excess of avoided costs in long term PPAs based on estimated LRACs. Thus, NYSEG's illegality of contract claim must be dismissed.

█ The sixth cause of action alleges that NYSEG is excused from performance under the PPAs because an essential purpose of the agreements—ensuring that ratepayers paid no more than avoided cost—has been frustrated.[78] Finally, the

---

77. The Court notes in the first instance that it retains no required independent jurisdiction over NYSEG's contract claims in the absence of either diversity or subject matter jurisdiction over the federal claims.

78. The doctrine of commercial frustration "is an ancient concept rooted in the common law." *In re Schenck Tours, Inc.,* 69 B.R. 906,

910 (Bankr.E.D.N.Y.), *aff'd* 75 B.R. 249 (E.D.N.Y.1987). It is triggered where:

> 1) a contingency—something unanticipated, unforeseeable or unexpected—has occurred; 2) the risk of the unexpected occurrence has not been allocated by agreement or otherwise; and 3) both parties can perform the contract but, as a result of the

seventh claim asserts that the PPAs should be voided because the parties entered into the contracts based on a mutual mistake,[79] that they assumed the rates charged would not violate PURPA's avoided cost ceiling. Saranac and Lockport argue that NYSEG's contract claims are redundant of its untimely administrative challenges to FERC and PSC. Moreover, they contend there was no mutual mistake or frustration of purpose because the present circumstances were foreseeable at the time the contracts were approved and entered.

In *In re Schenck Tours*, the court clarified respect for commercial contracts as follows:

> Sanctity of contract constitutes the most fundamental underpinning of commerce. The community's legitimate need for the stability of business dealings requires the enforcement of contracts according to their terms. This need finds cogent expression in a strong public policy of upholding the validity of freely negotiated contracts, even unwise ones.

69 B.R. at 910–11. As such, courts do not generally relieve a competent contracting party from an "improvident agreement in the absence of fraud, misrepresentation or bad faith." *Id.* at 911. Application of these "sound" contractual principles is difficult in the present circumstances because in the first instance, NYSEG alleges it did not freely contract with the subject QFs. Rather, the utility claims it was forced to

enter these contracts pursuant to PURPA and that PSC supervised negotiations and ordered final contract terms.

The Court agrees that NYSEG did not "freely" contract in the sense that but for PURPA, it may not have chosen to enter into the PPAs with Saranac and Lockport for the terms as approved by PSC. These agreements are plainly the embodiment of a cooperative federal-state regulatory scheme designed to prevent utilities such as NYSEG from discriminating against QFs, thereby discouraging or even quashing development of the alternative energy industry. But contracting within specific regulatory compliance standards and under supervision of PSC is hardly a new concept for NYSEG, a heavily regulated public utility. Furthermore, the QF agreements were not "contracts of adhesion" which have historically been construed to protect unsophisticated parties with unequal influence over binding terms. The contracts were presented to PSC only after arduous negotiations by sophisticated companies led by aggressive business executives and shrewd counsel. The PPAs are, at bottom, unaffected by fraud, undue influence or overweening bargaining power. Moreover, NYSEG always retained the choice of appealing especially egregious contract terms or unlawful coercive action by PSC.

Based on these considerations, the Court rejects NYSEG's contention that these purchase contracts are especially

---

unforeseeable events, performance by one party would no longer give the other party what induced him to make the bargain in the first place. Thus frustrated, the latter party may rescind the contract.
*Id.* "Perhaps the most significant factor in the determination as to the applicability of the commercial frustration doctrine is the foreseeability of the contingency that actually occurred." *Id.*

**79.** The "mutual mistake" defense is properly applied "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances...." *In re Schenck Tours*, 69

B.R. at 913 (citing RESTATEMENT (SECOND) OF CONTRACTS § 152). However, the adversely affected party:

> bears the risk of the mistake when a) the risk as allocated to him by agreement of the parties, or b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient....

*Id.* "Contract avoidance on the grounds of mutual mistake is not permitted just because one party is disappointed in the hope that the facts accord with his wishes." *Id.* (citing *Backus v. MacLaury*, 278 A.D. 504, 507, 106 N.Y.S.2d 401 (4th Dep't 1951)).

subject to judicial scrutiny by virtue of their regulatory nature. Indeed, it is precisely because of their regulatory nature that the Court questions whether traditional contractual principles even apply to the PPAS. Nevertheless, to the extent that NYSEG contends that: 1) a principle purpose of the contracts—implementing PURPA which caps QF purchase rates at a utility's avoided costs—has been frustrated based on rates in the PPAs which are now in excess of NYSEG's avoided costs; and 2) the parties' mistaken "assumption" that contract rates would not violate PURPA was mutual and substantial, the Court disagrees. In the first instance, as discussed at length above, the "principle purpose" of PURPA contracts was to encourage cogeneration, not to ensure reasonable purchase rates for either utilities or consumers.

Furthermore, to suggest as NYSEG does, without apparently any sense of irony, that the parties were "mutually mistaken" about the risk that PPA rates would exceed avoided costs is paradoxical in light of the extensive attention paid to the need for a "true-up" or tracking mechanism in the contracts. Indeed, this risk was identified, discussed and reconciled by every party or entity even remotely affected by PURPA, including Congress in enacting the statute, FERC in prescribing the regulatory scheme, PSC in implementing it, utilities in forecasting LRACs, and QFs in making investment and other decisions. Consequently, NYSEG's contract claims against Saranac and Lockport must be dismissed.

D. *Motions to Dismiss PSC'S Cross-Claim*

PSC alleges in its cross-claim that FERC has violated PURPA by failing to reform the Saranac and Lockport contracts. For support, PSC relies on FPA Section 206(a), which authorizes FERC, after notice and hearing, to modify utility rates when the public interest so dictates, and PURPA Section 210(e), which requires FERC to reconsider QF exemption "from time to time." [80] PSC claims that FERC's inaction violates PURPA's incremental cost limitation and thus under the APA is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedures required by law.

PSC's position in this litigation is equivocal to say the least. While arguing that: 1) it fully and properly implemented PURPA by allowing Saranac and Lockport to "lock in" fifteen-year contract rates based on estimated LRACs; 2) it has no legal authority or continuing obligation to revise or modify these contracts which it—not FERC—ordered and approved; and 3) the PSC orders which set LRACs and established contract terms are long since final and unappealable, PSC contends that the contract rates violate PURPA and that FERC must reconcile them to NYSEG's current actual avoided costs. PSC's arguments fail on multiple levels, the first of which is subject matter jurisdiction.

To the extent that PSC relies on the jurisdictional predicate of the FPA for its cross-claim, it is precluded from doing so because it never petitioned FERC for a rehearing prior to seeking judicial review under the FPA as required by 16 U.S.C. § 825*l*(a). *See Town of Norwood, Mass. v. FERC,* 906 F.2d 772, 775 (D.C.Cir.1990) (since plaintiff had not previously presented FERC in petition for rehearing with arguments challenging denial of refund, court had no jurisdiction to hear them on appeal). Nor does it suffice that NYSEG has raised arguments in support of PSC's position in its petition for rehearing. *See Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,* 876 F.2d 109, 113 (D.C.Cir.1989) (jurisdictionally insignificant that one party raises is-

---

**80.** Pursuant to PURPA, FERC has exempted QFs from FPA § 206. *See* 18 C.F.R. § 292.601(c). PSC insists that FERC can change its regulations to remove QFs' exemption from FPA rate regulation and then modify the PPAs *prospectively*.

sue in petition for rehearing if party bringing request for judicial review did not). PSC's contention that it was excused from this jurisdictional prerequisite because FERC does not allow rehearing in cases brought "solely involving § 210 of PURPA"[81] is belied by the fact that it asks FERC to revisit QF exemptions pursuant to the FPA.

Even if this were not true, the District of Columbia Court of Appeals has exclusive jurisdiction over review of FERC actions under the FPA. *See* 16 U.S.C. § 825*l*(b). PSC's argument that the D.C. Circuit already declined jurisdiction in this matter and directed the parties to district court is just as deficient coming from PSC as from NYSEG. The D.C. Circuit did not conclude that there were, in fact, FPA questions in this case to resolve independent of NYSEG's PURPA enforcement claim. *See NYSEG v. FERC*, 117 F.3d at 1477 ("Although it is true that NYSEG requested relief under the FPA, the Commission's denial of that relief was based on determinations that would, if made binding upon the district court, be dispositive of any future enforcement action under § 210(h)."). Moreover, the Circuit court's decision did not confer subject matter jurisdiction over any of NYSEG's or PSC's claims in the district court nor could it.

Insofar as PSC's attempt to couch its cross-claim as an "enforcement" action against FERC, the very notion flies in the face of the statute. Section 210(h) of PURPA allows a cogenerator or utility to petition FERC to bring an enforcement action against a state public service commission for failure to implement PURPA. *See* 16 U.S.C. § 824a–3(h). If FERC declines to do so, the cogenerator or utility may bring its own enforcement action against the state commission. Here, PSC, a state utility commission, sues FERC for failure to revise contracts which PSC itself ordered in fully and properly implementing PURPA. The "enforcement" contemplated under the statute is enforcement of

FERC regulations against non-compliant state commissions. *See* 16 U.S.C. § 824a–3(f), (h). PSC turns PURPA inside out by seeking to enforce the statute's alleged rate cap against FERC when the agency already reconciled the "rate cap" with excessive contract rates in long term PPAs based on estimated LRACs in its regulations. *See* 29 C.F.R. § 292.304(a)(5). Thus, PSC cannot sue FERC under the guise of a Section 210(h) enforcement action. PSC provides no legal support for its vague contention that it seeks enforcement of Section 210 of PURPA "in general" against FERC.

 Finally, NYSEG's contention, on behalf of PSC, that the APA is a jurisdictional avenue to entertain PSC's cross-claim is flawed for several reasons, the most fatal being PSC's lack of standing to sue under the APA. PSC is not an "aggrieved party" within the meaning of the APA. *See* 5 U.S.C. § 702. PSC argues that it has standing, as *parens patriae*, to intervene in any action concerning New York ratepayers pursuant the Public Service Law which provides:

> It shall be the duty of counsel to the commission ... to represent and appear for the people of the state and the commission in all actions and proceedings involving any question under this chapter, or *within the jurisdiction of the commission*, and, if directed to do so to intervene, if possible, in any action or proceeding in which any such question is involved; to commence and prosecute all actions and proceedings directed or authorized....

N.Y.Pub.Serv.Law § 12 (emphasis added). The problem with this argument is that PSC no longer has jurisdiction over the Saranac and Lockport contracts. *Freehold* removed any shadow of doubt concerning the power of state public utility commissions to alter, revise or continually monitor PURPA contracts once they have been approved and signed. *See Freehold*,

---

81. See *NYSEG*, 72 F.E.R.C., at 61,067, 1995 WL 427321.

44 F.3d at 1194 ("[O]nce the [New Jersey Board of Regulatory Commissioners ("BRC") ] approved the power purchase agreement between [the QF] and [the utility] on the ground that the rates were consistent with avoided cost, any action or order by the BRC to reconsider its approval or to deny the passage of those rates to [the utility's] consumers under purported state authority was preempted by federal law."). PSC's statutory obligation to intervene in legal proceedings on behalf of New York consumers does not extend to matters beyond the bounds of its jurisdiction.

Furthermore, assuming *arguendo* that PSC has standing to proceed in the stead of New York's ratepayers, FERC's failure to consider PSC's alleged request for rulemaking in the underlying administrative proceeding does not provide grounds for APA review. Although PSC and NYSEG characterize its Notice of Intervention in the underlying FERC proceedings as requesting new rulemaking, PSC merely "urge[d] the Commission to modify the Lockport and Saranac exemptions under Federal Power Act § 206(a) and examine whether these facilities' prices continue to serve the public interest." It is true that PSC seeks only prospective modification of the PPA rates unlike NYSEG which seeks to recoup all monies paid in excess of its actual avoided costs over the life of the Saranac and Lockport contracts. However, PSC's intervening petition was as insufficient as NYSEG's underlying attempt to invoke the rulemaking authority of FERC. Like NYSEG, PSC made no reference to Section 553(e) of the APA. Thus, PSC's request for modification or waiver of PURPA rules, even if prospective only, was "too situation specific and too informal" because PSC merely asked FERC to waive or modify QF rate regulation exemptions to allow reformation of the Saranac and Lockport agreements. *South Hills*, 864 F.2d at 1084.

Even if none of the above were true, PSC's cross-claim would still fail for pre-cisely the same ultimate reason as NYSEG's claim against FERC—FERC has no authority to alter or waive its regulations or exemptions to the extent of altering, even prospectively, the terms of the Saranac and Lockport PPAS. Everything in PURPA's legislative and regulatory history supports the Court's conclusion that these QFs are entitled to the benefit of their bargain, even if at the expense of NYSEG and its ratepayers. The court in *Freehold* emphasized that "Congress intended to exempt qualified cogenerators from state *and federal* utility rate regulations." 44 F.3d at 1192 (emphasis added). It is not the Court's place to contemplate or reconsider the wisdom of Congress in enacting PURPA with all its complexity. Nor can the Court, in this instance, second-guess the administrative determination of FERC, an agency devoted solely to administration and regulation of the nation's energy policies. Courts are required to execute the laws as enacted, not as construed by litigants, even in the face of unpopular results.

## IV. Conclusion

Based on the foregoing, defendants' motions to dismiss NYSEG's complaint pursuant to Fed.R.Civ.P. 12(b) are GRANTED in their entirety. Furthermore, the motions by defendants FERC, Saranac and Lockport to dismiss PSC's cross-claim pursuant to Rule 12(b) of the Fed.R.Civ.P. are likewise GRANTED in their entirety. In light of this ruling, the motions by PSC and Independent Power Producers of New York to intervene as well as the motions for summary judgment or partial summary judgment filed by Saranac, PSC and NYSEG are denied as moot.

IT IS SO ORDERED.